ESI, INC., Plaintiff,

v.

The COASTAL CORPORATION, Coastal Power Company f/k/a Coastal Power Production Company, Coastal Salvadoran Power, Ltd., Coastal Nejapa, Ltd., Coastal Technology Salvador, S.A., La Casa Castro, S.A. de C.V., Crystal Power Company, Nejapa Power Company, L.L.C., Trigen Energy Corporation, EPEC Gas International, Inc. f/k/a Tenneco Gas International, Inc. and Latin American Energy Development, Inc. d/b/a Desarrollos Energeticos Latino Americanos, S.A., Defendants,

and various cross-claim actions.

No. 96 Civ. 7381(WCC).

United States District Court, S.D. New York.

Aug. 31, 1999.

Aydelott & Aydelott, Mount Kisco, New York, Christopher P. Keenan, of counsel, for plaintiff ESI, Inc.

Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, Florida, Pedro J. Martinez–Fraga, of counsel, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, New York City, Jeffrey B. Sklaroff, Stephen L. Saxl, of counsel, for defendants The Coastal Corporation, Coastal Power Company f/k/a Coastal Power Production Company, Coastal Salvadoran Power, Ltd., Coastal Nejapa, Ltd., Coastal Technology Salvador, S.A., La Casa Castro, S.A. de C.V., Crystal Power Company and Nejapa Power Company, L.L.C.

Fried, Frank, Harris, Shriver & Jacobson, New York City, Janice Mac Avoy, Barry G. Sher, Stephanie Goldstein, Sean Shields, of counsel, for defendant EPEC Gas International, Inc. f/k/a Tenneco Gas International, Inc.

Gauthier, Downing, Labarre, Beiser & Dean, Metairie, Louisiana, Edward F. Downing, III, John W. Houghtaling, II, of counsel, Schierberl & Wright, New York City, Mary A. Wright, of counsel, for defendant Latin American Energy Development, Inc. d/b/a Desarrollos Energeticos Latino Americanos, S.A.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This diversity action arises from a dispute as to the parties' relative ownership interests in an electric power plant located in El Salvador (the "Plant"). The action is presently before the Court on a welter of motions related to the Second Amended Complaint filed by plaintiff ESI, Inc. ("ESI"), and the Amended Answer to Second Amended Complaint, Counterclaim and Cross–Claim (the "Cross–Claim") filed by defendant Latin American Energy Development, Inc. d/b/a Desarrollos Energeticos Latino Americanos, S.A. ("Delasa"). The motions are more specifically described hereinafter; principally they seek dismissal of the various claims on grounds of lack of personal jurisdiction, *forum non conveniens* and failure to state a claim upon which relief may be granted.

## BACKGROUND

This Court has already set out a significant portion of the complex factual background of this case in *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F.Supp. 419 (S.D.N.Y.1998) (*"ESI I "*), which involved a motion to dismiss brought by defendant Coastal Power Company f/k/a Coastal Power Production Company ("Coastal Power"). For purposes of the instant motion, the Court assumes familiarity with that opinion and hereby incorporates its

factual discussion with a few exceptions which will be discussed more fully below.[1]

In *ESI I*, we discussed the factual background of, and various agreements involving, the initial bidding process, development, ownership, construction and operation of the Plant (the "Project"). We concluded our discussion with the sale by EPEC Gas International, Inc. f/k/a Tenneco Gas International, Inc. ("Tenneco") of its interest in the Project to defendant Coastal Power. ESI has since had an opportunity to conduct further discovery with respect to the current ownership structure of the Plant and has uncovered a complex organization of affiliated companies through which profits from the Plant are ultimately distributed to Coastal Power and La Casa Castro, S.A. de C.V. ("LCC").[2] Indeed, Tenneco assigned its interest in the Project, not to Coastal Power, but to Coastal Salvadoran Power Ltd. ("Coastal Salvador"), a wholly owned subsidiary of Coastal Power.

## I. The Coastal Affiliates' Acquisition of Tenneco's Interest in the Project

Robert C. Hart, as President of Coastal Power set forth the terms by which Coastal Power would acquire Tenneco's interest in the Project in a Letter Agreement dated July 27, 1994. *See* Pl's Ex. A.[3] This Letter Agreement indicated that either Coastal Power or an "affiliate designated by Coastal Power" would purchase Tenneco's interest in the Project subject to the approval of the transaction by the Board of Directors of The Coastal Corporation ("Coastal Corp."),[4] Coastal Power's parent corporation. *See id.*[5] It was clear from the outset that Coastal Corp. would have to guarantee the loans acquired by Coastal Power or its affiliates in connection with the financing of the Project. *See* Pl's Ex. E ("Construction financing of approximately $80 million will require a Coastal [Corp.] guarantee").

Coastal Corp. authorized the transaction on July 27, 1994 [6] and Tenneco transferred its interest in the Project to Coastal Salvador,[7] a wholly owned subsidiary of Coastal Power, pursuant to a Purchase Agreement dated July 29, 1994. *See* Pl's Ex. L. The Purchase Agreement was signed by Robert C. Hart, as President of Coastal Salvador. *See id.* Coastal Salvador maintains that the Purchase Agreement was primarily negotiated and executed in Texas, although it admits to occasional telephone

1. See also *ESI, Inc. v. Coastal Power Prod. Co.*, 13 F.Supp.2d 495 (S.D.N.Y.1998) *("ESI II ")* wherein this Court denied defendant La Casa Castro's motion to dismiss ESI's Amended Complaint.

2. Therefore, if any statements of fact in this opinion contradict those made in *ESI I*, the facts set forth herein control.

3. Unless otherwise noted, references to "Pl's Ex. ___" are to the Exhibits attached to the Affidavit of Christopher P. Keenan ("Keenan Aff.") submitted by ESI in opposition to Coastal Salvador, et al.'s Motion to Dismiss.

4. Coastal Corp. and its wholly owned subsidiary, Coastal Power, are both Delaware corporations with their principal place of business at Nine Greenway Plaza, Houston, Texas. *See* ESI's 2nd Amd.Compl. at ¶¶ 2, 3; *see also* Coastal Corp.'s Annual Report for fiscal year ending December 31, 1998 filed with the U.S. Securities and Exchange Commission ("1998 Form 10K").

5. See also the Inter–Corporate Correspondence from Coastal Power to the Board of Directors of Coastal Corp., dated July 25, 1994 (Pl's Ex. G) and the Inter–Corporate Memorandum from Coastal Power to Coastal Corp., dated July 26, 1994 (Pl's Ex. E) requesting the approval of Coastal Corp.'s Board of Directors to acquire, construct, own and operate the Plant.

6. See the Certificate of Board Resolution of Coastal Corp. dated July 27, 1994, signed by Austin M. O'Toole as Senior Vice President and Secretary of Coastal Corp. (Pl's Ex. H).

7. Coastal Salvador is a Cayman Islands corporation with its principal place of business at Nine Greenway Plaza, Houston, Texas. *See* ESI's 2nd Amd.Compl. at ¶ 4; Pl's Ex. L at § 10.2; *see also* the Affidavit of Austin M. O'Toole as Corporate Representative of Coastal Salvador submitted in support of its Motion to Dismiss ("Coastal Salvador Aff.")

communications with Tenneco's counsel in New York.[8]

Under the terms of the Purchase Agreement, Tenneco agreed to transfer and assign to Coastal Salvador (or its designee) Tenneco's interest in the Power Purchase Agreement ("PPA"), the Engineering, Procurement and Construction Contract with Wartsila Diesel ("Wartsila"), as amended on June 17, 1994 (also known as the "Amended EPC Contract" or "Turnkey Contract"), and Tenneco's other tangible and intangible rights relating to the Project. *See* Pl's Exs. A, B, K and L.

As contemplated by the Purchase Agreement, Tenneco assigned the PPA and the Turnkey Contract[9] to Coastal Salvador[10] on July 29, 1994.[11] But not until Coastal Power had guaranteed all of the obligations of Coastal Salvador ("and/or an El Salvador limited partnership of which Coastal Salvador is the General Partner") under the PPA,[12] and Coastal Salvador's Board had authorized the assignment of the PPA to Coastal Salvador "and/or an El Salvador limited partnership of which Coastal Salvador will be the general partner and a limited partner." [13]

## II. *Ownership Structure and Financing of the Project*

The "El Salvador limited partnership" contemplated by the parties was to be the Project entity that ultimately owned and operated the Plant and was to be jointly owned by Coastal Power and LCC affiliates through which the profits from the Plant would flow back to Coastal Power and LCC.[14] The proposed structure and financing arrangements for the Project entity went through numerous permutations. *See* Pl's Exs. V, W and X. The parties ultimately decided on a lease financing model which required the creation of a limited liability company to be owned by affiliates of Coastal Power and LCC, and a U.S. special purpose trust.[15]

The Project entity formed to own and operate the Plant is Nejapa Power Company, L.L.C. ("Nejapa Power"), a Delaware

8. *See* Affidavit of Carl E. Wasmuth, Jr., counsel for Coastal Corp., submitted by Coastal Salvador, et al. with their Reply Memorandum of Law in support of their Motion to Dismiss ("Wasmuth Aff.") at ¶ 4.

9. The Turnkey Contract contains a New York choice-of-law provision. *See* Pl's Ex. C at § 29.2.

10. Actually, Coastal Salvador designated Coastal Aruba Holding Company N.V. to receive the assignment of the PPA (Pl's Ex. N). The PPA was then modified to allow its assignment to "a single-purpose entity" especially created by Coastal Power to own and operate the Plant, and that would be duly registered and authorized to do business in El Salvador, and whose obligations would be guaranteed by Coastal Corp. and Coastal Power. *See* Pl's Ex. P, Modification # 2 to the PPA, dated July 30, 1994, signed by Robert C. Hart on behalf of Coastal Power.

11. The respective Assignment and Assumption Agreements are attached as Pl's Exs. N and M, respectively. Coastal Salvador maintains that the Turnkey Contract Assignment and Assumption Agreement was primarily negotiated and executed in Texas, although it admits to occasional telephone communications with Tenneco's counsel in New York (Wasmuth Aff. at ¶ 5).

12. *See* Pl's Ex. I, the Certificate of Board of Resolution by Coastal Power, dated July 27, 1994, signed by Austin M. O'Toole as Senior Vice President and Secretary of Coastal Power.

13. *See* Pl's Ex. J, the Certificate of Board Resolution of Coastal Salvador, dated July 27, 1994, and signed by Austin M. O'Toole as Senior Vice President and Secretary of Coastal Salvador.

14. *See* Pl's Ex. U, Letter Agreement between Coastal Power and LCC dated July 28, 1994 regarding LCC's ownership interest in the Project company and additional fees to be paid to LCC and Coastal Power.

15. *See* Pl's Ex. X, Coastal Power's memorandum to LCC, dated December 21, 1994 with an attached Economic Model for the Project, setting forth their understanding and agreement regarding the ownership structure, lease financing, and economics of the Project.

limited liability company.[16] Nejapa Power is owned 99% by the special purpose trust, .5% by Coastal Salvador, and .5% by Coastal Nejapa, Ltd. ("Coastal Nejapa"),[17] which in turn is owned 90% by Coastal Salvador and 10% by Crystal Power Company, Ltd. ("Crystal Power"), a wholly owned subsidiary of LCC.[18] The 99% ownership of Nejapa Power held by the special purpose trust is then "leased" to Coastal Nejapa, resulting in the flow all benefits of ownership through to the wholly owned affiliates of Coastal Power and LCC.[19] Coastal Power and LCC signed a Letter Agreement confirming this arrangement on December 29, 1994. *See* Pl's Ex. Y.[20]

The affiliates of Coastal Power and LCC entered into five key agreements, dated as of December 28, 1994, in order to effectuate this arrangement: (1) the Shareholders Agreement of Coastal Nejapa; (2) the Subscription Agreement; (3) the Declaration of Trust for 1994 El Salvador Power Trust; (4) the Certificate Purchase Agreement; and (5) the Lease Agreement. In addition, Nejapa Power and Coastal Technology Salvador, S.A. ("CTS") entered into an Administrative Services Agreement. Each of these agreements will be discussed in turn.

### A. *The Shareholders Agreement*

In the Shareholders Agreement of Coastal Nejapa (Pl's Ex. FF), Crystal Power and Coastal Salvador acknowledge that Coastal Nejapa was formed for the purpose of holding an ownership interest in Nejapa Power and confirm the ownership structure of Nejapa Power as outlined above. Under the Shareholders Agreement, the authorized share capital of Coastal Nejapa is divided into Class A, B and C shares. Class A shares were issued to Crystal Power, Class B shares were issued to Coastal Salvador, and Class C shares were to be purchased by Crystal Power at a later date. This left Crystal Power with 10% ownership of Coastal Nejapa which would increase to 15% by the issuance of Class C shares to Crystal in the event that it complied with the Certificate Purchase Agreement discussed below.

Section 5.1 of the Shareholders Agreement, entitled "Governing Law; Jurisdictional Matters" states in pertinent part:

> This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York.... Any legal action or proceeding with respect to this Agreement may be brought in the courts of the State of New York ... [or in the United States District Court] for the Southern District of New York.... The parties hereby accept for themselves and in respect of their property, generally and unconditionally, the jurisdiction of the aforesaid courts. The parties hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds

---

16. Of course, the PPA was modified accordingly, *i.e.*, to authorize the assignment of the PPA to Nejapa Power, with the guarantees of Coastal Corp. and Coastal Power. *See* Pl's Ex. Q, Modification # 3 to the PPA, dated December 14, 1994, signed by Robert C. Hart on behalf of Coastal Aruba Holding Company, N.V. and by James Gray, as Vice President of Nejapa Power.

17. Coastal Nejapa is a Cayman Islands corporation with its principal place of business in Texas. *See* ESI's 2nd Amd.Compl. at ¶ 5; *Compare* the Affidavit of Austin M. O'Toole as Corporate Representative of Coastal Nejapa submitted by in support of its Motion to Dismiss ("Coastal Nejapa Aff.") at ¶ 3.

18. Crystal Power, a Bahamian company, was formed by LCC to hold its interest in the Project. *See* Affidavit of Roberto Vilanova as Corporate Representative of Crystal Power submitted in support of its Motion to Dismiss ("Vilanova Aff.") at ¶¶ 3–5.

19. For a more detailed description of the Project's ownership structure and how the income and profits of the Project are distributed to Coastal Power and LCC through their affiliates, see Pl's Exs. F, S, T, X and Y.

20. The Letter Agreement was signed by Robert C. Hart on behalf of Coastal Power and Coastal Salvador, and by Roberto Vilanova on behalf of LCC. *Id.*

of *forum non-conveniens*, which they may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.

*See* Pl's Ex. FF, § 5.1 (emphasis in original). Coastal Salvador and Crystal Power, therefore, consented to personal jurisdiction and venue in any action brought in a New York .forum with respect to the Shareholders Agreement. The above-quoted provision is incorporated verbatim or virtually so in many of the other contracts discussed below; this provision will hereinafter be referred to as the "Forum Selection Clause."

Section 4.1 provides that "all notices, consents, directions, approvals, instructions, requests and other communications" for Coastal Nejapa or Coastal Salvador shall be given to Coastal Corp. and, any such notices for Crystal Power shall be given to Crystal Power c/o LCC.

The Shareholders Agreement was signed by Robert C. Hart, as President of Coastal Salvador and by Roberto Vilanova, as President of Crystal Power and was allegedly negotiated and executed by the parties in Texas and El Salvador, respectively.[21]

### B. *The Subscription Agreement*

The Subscription Agreement entered by and between Crystal Power, LCC, Coastal Salvador and Coastal Nejapa (Pl's Ex. KK) sets forth the terms under which Crystal Power agreed to subscribe for and purchase (and Nejapa Power agreed to issue to Crystal Power) Class C shares of Coastal Nejapa. LCC covenanted that, at all relevant times, it would retain the power to vote all Class A and Class C shares issued to Crystal Power and would cause Crystal Power to perform all of its obli-

gations under the Certificate Purchase Agreement discussed below.

Section 5.03 contains the Forum Selection Clause. It also provides for notices to Coastal Nejapa and Coastal Salvador to be sent to Coastal Corp., and notices to Crystal Power to be sent c/o LCC. The Subscription Agreement was signed by Roberto Vilanova, as President of LCC and Crystal Power, and by Robert C. Hart, as President of Coastal Salvador and Coastal Nejapa, and was allegedly negotiated and executed by the parties in El Salvador and/or Texas.[22]

### C. *The Declaration of Trust for 1994 El Salvador Power Trust*

The parties financed the construction of the Plant by having a number of New York banks, including Citibank, N.A., The Bank of New York, The Canadian Imperial Bank of Commerce—New York Agency, and Kredietbank N.V.—New York Branch buy into a trust. The land, construction in progress, and other fixed assets of the Plant were then transferred to the trust. The trust assets (which would then be leased to Coastal Nejapa) consisted of a 99% Trust Membership Interest in Nejapa Power and a project loan to Nejapa Power.[23] Via the Declaration of Trust, State Street Bank and Trust Company, a Massachusetts trust company, in the capacity as Trustee imposed a trust on these trust assets thereby creating the 1994 El Salvador Power Trust (the "Trust") (Pl's Ex. WW).[24]

### D. *Certificate Purchase Agreement*

The Certificate Purchase Agreement entered into between Crystal Power, Coastal Salvador and State Street Bank and Trust Company, as Trustee of the 1994 El Salvador Power Trust (Pl's Ex. RR), obligates Crystal Power to purchase a Term Certifi-

---

21. *See* Wasmuth Aff. at ¶ 8.

22. *See* Wasmuth Aff., at ¶ 13.

23. *See* Pl's Exs. OO and WW.

24. The Declaration of Trust is governed by and interpreted in accordance with the laws of the State of Massachusetts (Pl's Ex. WW, § 10.10) and contains no provisions relevant to the issues raised in the instant motions.

cate from the trust (*i.e.,* invest additional capital in the Project) upon completion of the Plant. Upon purchasing the Term Certificate, Crystal Power would be issued Class C shares in Coastal Nejapa.

It contains the Forum Selection Clause at § 16, and requires any notices to Crystal Power to be sent c/o LCC and any notices to Coastal Salvador to be sent to Coastal Corp. (*Id.* at § 9). The Certificate Purchase Agreement was signed by Roberto Vilanova, on behalf of Crystal Power, and by Robert C. Hart, as President of Coastal Salvador. It was allegedly negotiated face-to-face and executed in Texas, however, some telephone calls were placed and facsimiles sent to New York.[25]

### E. Lease Agreement

Nejapa Power and Coastal Nejapa entered into a Lease Agreement with State Street Bank and Trust Company, as Trustee under the Declaration of Trust, in which Coastal Nejapa agreed to lease (and, in the future purchase some or all of) the Trust's 99% ownership interest in Nejapa Power (Pl's Ex. OO). Coastal Nejapa, therefore leased the Trust's rights to receive cash distributions or income flowing from Nejapa Power.

Section 6.07 of the Lease Agreement contains the Forum Selection Clause. Robert C. Hart signed the Lease Agreement on behalf of both Coastal Nejapa and Nejapa Power.[26]

### F. Administrative Services Agreement

Lastly, Nejapa Power and CTS entered into the Administrative Services Agreement, dated December 1, 1994, which gave CTS complete managerial control over the affairs and business of Nejapa Power (Pl's Ex. DD). CTS, a Cayman Islands corporation with a principal place of business in Texas, is a wholly owned indirect subsidiary of Coastal Corp.[27]

Although the Administrative Services Agreement is governed by Texas law (*Id.* at § 7.7), it contains both a New York forum-selection and waiver of objections to jurisdiction and venue clause similar to that in the Shareholders Agreement (*Id.* at § 7.10.1). Copies of all notices to CTS are to be sent to Coastal Technology, Inc., and all notices to Nejapa Power are to be sent in care of Coastal Corp., with a copy to Coastal Power (*Id.* at § 7.1).

The Administrative Services Agreement was negotiated and executed in Texas, and was signed by Robert C. Hart on behalf of both Nejapa Power and CTS.[28] Indeed, in what can only be described as the antithesis of an arm's length transaction, CTS signed the agreement on behalf of Nejapa Power as its "Manager." [29]

None of the agreements executed by and between Tenneco, Coastal Corp., Coastal Power, Coastal Salvador, Coastal Nejapa, Nejapa Power, CTS, Crystal Power and LCC addresses ESI's or Delasa's claimed ownership interests in the Project. However, LCC and Delasa had entered into an agreement on October 31, 1994 entitled the "Acuerdo" which stated that LCC would give Delasa 20% of the income

---

25. *See* Affidavit of Leslie Wm. Adams, submitted by Coastal Salvador, et al. with their Reply Memorandum of Law in support of their Motion to Dismiss ("Adams Aff.") at ¶ 6.

26. Robert C. Hart, as President of CTS signed on behalf of Nejapa Power as its Manager.

27. *See* Coastal Corp.'s 1998 Form 10K. CTS's immediate corporate parent is Coastal Technology, Inc., a Delaware corporation with its principal place of business in Texas. Coastal Technology, Inc. is a wholly owned subsidiary of Coastal Corp. (*Id.*)

28. *See* Wasmuth Aff. at ¶ 6.

29. *See also* the Amended and Restated Administrative Services Agreement, dated September 1, 1995 (Pl's Ex. EE), negotiated and executed in Texas and/or El Salvador and signed by Robert C. Hart on behalf of Nejapa Power and CTS (Wasmuth Aff. at ¶ 7). The Amended and Restated Administrative Services Agreement retains the New York forum selection and waiver of objections to jurisdiction and venue clause (Pl's Ex. EE, § 7.10.1).

it received from the Plant during the life of the Project.[30]

### III. *Operation and Expansion of the Plant*

The Project, as initially envisioned, involved the development, construction and operation of a 91MW heavy fuel oil fired power plant.[31] However, in June 1995, Coastal Corp. authorized a 53MW expansion of the Plant (Pl's Ex. R). LCC, of course, cooperated with Coastal Power to obtain the required modification of the PPA.[32] On July 14, 1995, Crystal Power and Coastal Salvador executed a Memo of Understanding regarding the expansion of the Project which documented the parties' consent to amend the original implementing agreements to cover ownership and financing changes due to the expansion of the Plant (Pl's Ex. BB). The Memo of Understanding was signed by Robert C. Hart on behalf of Coastal Salvador (and Coastal Power which had to consent to the agreement), and by Roberto Vilanova on behalf of Crystal Power (and LCC which had to consent to the agreement).

All five implementing documents were amended accordingly on November 28, 1995.[33] Each amended and restated

agreement or document contains a choice-of-law and/or forum selection clause identical to that in the original document.[34] With but one exception, the amended and restated agreements were executed by the same individuals as the original documents,[35] and each amended and restated agreement was allegedly negotiated and executed in Texas and/or El Salvador.[36]

As a result of the expansion, Crystal Power was given the opportunity to purchase additional Class C shares of Coastal Nejapa. On January 31, 1996, the parties executed the first amendments to the Amended and Restated Shareholders Agreement and Subscription Agreement in order to allow Crystal Power to purchase the additional Class C shares.[37] None of these amendments affected the choice-of-law or forum selection clauses contained in the preceding contracts and documents. With a few exceptions, the amendments were executed by the same individuals as the original documents,[38] and were allegedly negotiated and executed in Texas and/or El Salvador.[39]

On March 27, 1996, Coastal Corp. sent a letter to Credit Suisse–First Boston requesting it to finance Crystal Power/LCC's

30. *See* Delasa's Amended Answer to Second Amended Complaint, Counterclaim and Cross–Claim at ¶ 299. Delasa and LCC executed a Supplemental Agreement to the Acuerdo on January 14, 1995. *Id.* at ¶ 301.

31. *See* Pl's Ex. D, Coastal Corp. and Subsidiaries Authority for Expenditure.

32. *See* Pl's Ex. Z, letter from Coastal Power to LCC regarding the expansion of the Project.

33. *See* the Amended and Restated Shareholders Agreement (Pl's Ex. GG); Amended and Restated Subscription Agreement (Pl's Ex. LL); Amended and Restated Certificate Purchase Agreement (Pl's Ex. RR); Amended and Restated Lease (Pl's Ex. PP); and Amended and Restated Declaration of Trust (Pl's Ex. XX).

34. *See* Pl's Ex. GG at § 7.1; Pl's Ex. LL at § 5.03; Pl's Ex. RR at § 16; Pl's Ex. PP at § 6.07; Pl's Ex. XX at § 10.10.

35. James W. Gray executed the Amended and Restated Subscription Agreement as Senior

Vice President of Coastal Nejapa (Pl's Ex. LL).

36. *See* Wasmuth Aff. at ¶¶ 9, 14; Adams Aff. at ¶¶ 5, 7.

37. *See* Amendment No. 1 to Amended and Restated Shareholders Agreement (Pl's Ex. HH) and Amendment No. 1 to Amended and Restated Subscription Agreement (Pl's Ex. MM). Although referenced by plaintiff, there is no record of an Amendment No. 1 to Amended and Restated Certificate Purchase Agreement attached as Pl's Ex. RR.

38. Amendment No. 1 to Amended and Restated Subscription Agreement was executed by Donald H. Gullquist as Senior Vice President of Coastal Salvador and by James W. Gray as Senior Vice President of Coastal Nejapa (Pl's Ex. MM).

39. *See* Wasmuth Aff. at ¶ 10.

$4.7 million purchase of the Class C shares. (Pl's Ex. CC). In that letter, Coastal Corp. informed Credit Suisse that Roberto Vilanova was willing to pledge his entire interest in the Plant as collateral, with Coastal Corp.'s approval. Ultimately, Credit Suisse did finance Roberto Vilanova's purchase of the Class C shares for $4.7 million. Indeed, Credit Suisse lent Mr. Vilanova $7.2 million with Coastal Corp.'s guarantee. *See* Pl's Ex. AA, the Security and Pledge Agreement between Crystal Power and Credit Suisse–First Boston, dated November 29, 1996. The Security and Pledge Agreement *contains* a provision similar to the Forum Selection Clause at § 18.

When Crystal Power exercised its option to purchase the additional Class C shares on November 29, 1996, the implementing documents were amended once again.[40] None of these amendments affected the choice-of-law or forum selection clauses contained in the preceding contracts and documents. Indeed, almost all the amendments themselves contain New York choice-of-law provisions, if not New York forum selection and acceptance of jurisdiction and venue provisions.[41]

The amendments were allegedly negotiated and executed in Texas and/or El Salvador,[42] and most of them were executed by the same individuals as the original documents. However, Coastal Corp. entered into the First Amendment to the Amended and Restated Lease "to recognize and confirm the terms of [the amendment] with respect to [its] obligations under those Operative Documents to which it is a party" (Pl's Ex. QQ, § 5). Donald H. Gullquist then executed the First Amend-

ment to the Amended and Restated Lease as Senior Vice President of Coastal Corp., Coastal Nejapa and CTS in its capacity as Manager of Nejapa Power.

Coastal Salvador, Coastal Nejapa, Crystal Power, LCC and Credit Suisse also signed a Consent and Agreement dated November 29, 1996.[43] The Consent and Agreement also contains the Forum Selection Clause. Although the parties admit that they engaged in negotiations by telephone and facsimile between Texas and New York, they claim that no face-to-face meetings took place in New York. *See* Adams Aff. at ¶ 8. The agreement was executed by Coastal Salvador and Coastal Nejapa in Texas, by LCC and Crystal Power in El Salvador, and by Credit Suisse–First Boston apparently in New York. *See id.*

Crystal Power purchased the Class C shares under a Term Trust Certificate with State Street Bank and Trust Company, dated November 29, 1996. Pl's Ex. SS. The Term Trust Certificate also contains a New York choice-of-law clause. Credit Suisse–First Boston of New York financed Crystal Power's purchase of the Term Trust Certificate (Class C shares). As collateral for this loan, Crystal Power had to pledge all of its Class A and C shares of Coastal Nejapa and its entire interest in the income and profits of the Plant.[44]

The Amended and Restated Security and Pledge Agreement contains the Forum Selection Clause at § 21. Further, pursuant to Section 7 of the agreement, Crystal Power established a collateral account and a reserve account with Credit Suisse–First Boston in New York. More-

---

40. *See* the Second Amendment to Amended and Restated Shareholders Agreement (Pl's Ex. II); Second Amendment to Amended and Restated Subscription Agreement (Pl's Ex. NN); Second Amended and Restated Declaration of Trust for 1994 El Salvador Power Trust (Pl's Ex. YY); and First Amendment to Amended and Restated Lease (Pl's Ex. QQ).

41. *See* Pl's Exs. II at § 5, NN at § 6, QQ at § 6.

42. *See* Wasmuth Aff. at ¶¶ 11, 15.

43. *See* Adams Aff. at ¶ 8.

44. *See* Pl's Ex. AA, the Amended and Restated Security and Pledge Agreement between Crystal Power, Credit Suisse–First Boston and Coastal Corp. dated February 27, 1998.

over, the agreement required Crystal Power to designate Credit Suisse–First Boston in New York and Coastal Corp. as its attorney-in-fact, authorizing them "to take any action, to execute any instruments and to exercise any rights, privileges, options, elections or powers of [Crystal Power]" deemed necessary with respect to the bank collateral and Coastal Corp. collateral (*i.e.*, pledged Class A and C shares of Coastal Nejapa), respectively. *Id.* at § 8. There is no indication in the record as to where or by whom this agreement was negotiated or executed.

Finally, to comply with the requirements of the Amended and Restated Security and Pledge Agreement, Crystal Power and Coastal Salvador entered into the Third Amendment to Amended and Restated Shareholders Agreement on February 27, 1998 (Pl's Ex. JJ). This amendment did not affect the previous and itself contains the Forum Selection Clause at § 5. Again, this amendment was negotiated and executed by Roberto Vilanova, as President of Crystal Power, in El Salvador, and by Robert C. Hart, as President of Coastal Salvador, in Texas.[45]

Since the Plant commenced production in September 1995, the government of El Salvador, through its nationally-owned utility, Comision Ejecutiva Hidroelectica del Rio Lempa ("CEL"), has been making payments to Nejapa Power for the electricity produced by the Plant. These payments are made to a Nejapa Power bank account at Citibank, N.A. in New York,

New York.[46] This account is utilized to receive the revenues and pay the operating expenses of Nejapa Power. It is also the account from which Nejapa Power remits its distributions of the Plant's income to Coastal Nejapa, Coastal Salvador and the 1994 El Salvador Power Trust.[47] The income paid to the Trust is then "leased" to Coastal Nejapa and, pursuant to the terms of the Lease, Nejapa Power pays "rent" to Citibank, N.A. "as Agent." [48]

Therefore, all income from the operation of the Plant is ultimately distributed to LCC and Coastal Power through their affiliates, to the exclusion of ESI and Delasa. In its 1998 Form 10K, Coastal Corp. stated that "Coastal Power, through its affiliates, currently receives approximately 86.6% of the distributable cash flow [from the Plant] and [LCC] receives the remainder." To date, LCC, Coastal Power and their affiliates have refused to recognize ESI's or Delasa's interest in the Project and the income from the Plant.

## IV. *ESI's and Delasa's Amended Pleadings*

With leave of court, ESI filed its Second Amended Complaint on September 16, 1998, naming Coastal Corp., Coastal Salvador, Coastal Nejapa, CTS, Nejapa Power, Crystal Power, Trigen Energy Corporation ("Trigen") and Tenneco as additional defendants.[49] Coastal Corp., Coastal Salvador, Coastal Nejapa and CTS are affiliates of Coastal Power. Crystal Power is an affiliate of LCC.

---

**45.** *See* Wasmuth Aff. at ¶ 12.

**46.** *See* the Affidavit of Edward Sereno, Controller of Coastal Salvador, submitted on behalf of Coastal Salvador, et al. with their Reply Memorandum of Law in support of their Motion to Dismiss ("Sereno Aff."), at ¶ 4.

**47.** Citibank, N.A. makes such disbursements upon receiving specific instructions from Nejapa Power. *See* Sereno Aff. at ¶ 4.

**48.** *See* Pl's Ex. OO. Nejapa Power has also contracted to purchase fuel for the Plant from

yet another Coastal Corp. affiliate, Coastal Petroleum, N.V. Pursuant to the terms of the fuel purchase agreement, Nejapa Power sends all fuel payments to Coastal Petroleum, N.V.'s account at Bankers Trust Company in New York. *See* Sereno Aff. at ¶ 5.

**49.** ESI subsequently dismissed all claims against Trigen and Delasa. Therefore, any future reference to "all defendants" will not include Trigen or Delasa. Trigen and Delasa have also dismissed all cross-claims against each other but cross-claims still exist between Trigen and the remaining defendants and Delasa and the remaining defendants.

In its Second Amended Complaint, ESI puts forth the following claims: (1) the First Claim, against all defendants except Tenneco, seeks a declaratory judgment that, pursuant to the Three–Party Agreement and the Delasa–ESI Assignment, ESI has a valid and enforceable ownership interest in 2.5% of the Project and the Plant's income; (2) the Second Claim, against all defendants except Tenneco, alleges damages related to ESI's status as an intended third-party beneficiary of the Power Purchase Agreement; (3) the Third Claim, against all defendants, seeks damages for breach of the Three–Party Agreement; (4) the Fourth Claim, against all defendants except LCC, Crystal Power and Nejapa Power, alleges tortious interference with the Three–Party Agreement; (5) the Fifth Claim, against all defendants except Coastal Corp. and Nejapa Power, alleges damages related to ESI's status as an intended third-party beneficiary of the Three–Party Agreement; (6) the Sixth Claim, against all defendants except Nejapa Power, alleges breach of fiduciary duty; (7) the Eighth [50] Claim, against all defendants except Nejapa Power, alleges tortious interference with the DELASA–ESI Assignment; (8) the Ninth Claim, against all defendants except Tenneco, seeks an accounting and the imposition of a constructive trust; (9) the Tenth Claim, against all defendants, alleges unjust enrichment; (10) the Eleventh Claim, based on promissory estoppel, alleges that all defendants should be estopped from denying ESI's 2.5% interest in the Project and the Plant's income; and finally (11) the Twelfth Claim seeks damages for fraud against LCC only.

On October 26, 1998, Delasa filed its Amended Answer to the Second Amended Complaint, Counterclaim [51] and Cross–Claim naming Coastal Corp., Coastal Salvador, Coastal Nejapa, CTS, Nejapa Power, Crystal Power, Trigen and Tenneco as additional cross-claim defendants and asserting the following by way of Cross–Claim [52]: (1) the First Claim, against all cross-claim defendants except Tenneco, seeks a declaratory judgment that, pursuant to the Three–Party Agreement, Delasa has a valid and enforceable ownership interest in 10% of the Project and the power plant's income; (2) the Second Claim, against all cross-claim defendants, seeks a declaratory judgment that Delasa was a joint venturer with Trigen, LCC (on its own and through its affiliate Crystal Power), Tenneco and Coastal Power (on its own and through its affiliates); (3) the Third Claim, against all cross-claim defendants except Nejapa Power, alleges breach of fiduciary duty; (4) the Fourth Claim, against all cross-claim defendants except Tenneco, seeks an accounting and the imposition of a constructive trust; (5) the Fifth Claim, against all cross-claim defendants, seeks damages for breach of the Three–Party Agreement; (6) the Sixth Claim, against all cross-claim defendants except LCC and Crystal Power, alleges tortious interference with the Three–Party Agreement; (7) the Seventh Claim, against all cross-claim defendants except Tenneco, alleges damages related to Delasa's status as an intended third-party beneficiary of the Power Purchase Agreement; (8) the Eighth Claim, against all cross-claim defendants except Crystal Power, alleges intentional inducement to breach fiduciary duties; (9) the Ninth Claim, based on promissory estoppel, alleges that Tenneco and LCC should be estopped from denying Delasa's 10% interest in the Project and the Plant's income; (10) the Tenth Claim

---

**50.** The Seventh Claim, alleging breach of contract against Delasa only, will not be discussed because all claims against Delasa have been voluntarily dismissed by ESI.

**51.** Delasa subsequently dismissed, with prejudice, its counterclaim against ESI.

**52.** All cross-claims asserted against Trigen and LCC were later dismissed by Delasa without prejudice (Delasa is attempting to enforce, in another forum, a Memorandum of Settlement entered into with LCC). Therefore, any future reference to "all cross-claim defendants" will not include Trigen or LCC.

seeks damages for fraud against Tenneco and Coastal Power; and (11) the Twelfth [53] Claim, against all cross-claim defendants, alleges unjust enrichment.

Defendants Coastal Salvador, Coastal Nejapa, CTS, Nejapa Power and Crystal Power now move: (1) to dismiss ESI's Second Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction and pursuant to the doctrine of *forum non conveniens* or, in the alternative, pursuant to Fed.R.Civ.P. 12(e) for a more definite statement of the allegations against them; and (2) to dismiss Delasa's Cross–Claim pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction and pursuant to the doctrine of *forum non conveniens*. ESI cross-moves for sanctions against Coastal Salvador, Coastal Nejapa, CTS, Nejapa Power, Crystal Power and their attorneys pursuant to Fed. R.Civ.P. 11(b) and (c).

Defendant Coastal Power moves pursuant to Fed.R.Civ.P. 12(f), to strike the Second and Fourth Claims, allegations of conspiracy and additional parties named as defendants in ESI's Second Amended Complaint.

In addition, Tenneco moves to dismiss: (1) the Third, Fourth, Fifth, Sixth, Eighth and Eleventh Claims of ESI's Second Amended Complaint pursuant to Fed. R.Civ.P. 12(b)(6); and (2) Delasa's Cross–Claim it its entirety on abstention grounds or, in the alternative, the Second, Third and Fifth Claims of Delasa's Cross–Claim pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

Next, LCC moves to dismiss the Twelfth Claim in ESI's Second Amended Complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) for failure to state a claim upon which relief may be granted. ESI has filed a cross-motion for leave to amend pursuant to Fed.R.Civ.P. 15(a) in the event that its Twelfth Claim is dismissed.

Finally, Coastal Power and LCC move to dismiss the Seventh and Tenth Claims in Delasa's Cross–Claim pursuant to Fed. R.Civ.P. 9(b) and 12(b)(6).

## DISCUSSION

### I. *Personal Jurisdiction*

■ Plaintiff bears the burden of establishing this Court's jurisdiction over the defendants. *See Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.1996). The nature of the plaintiff's obligation, however, "varies depending on the procedural posture of the litigation." *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990). If the court elects not to hold an evidentiary hearing, a motion to dismiss pursuant to Rule 12(b)(2) may be defeated if the plaintiff's complaint and affidavits contain sufficient allegations to establish a prima facie showing of jurisdiction.[54] *See Kronisch v. United States*, 150 F.3d 112, 130 (2d Cir. 1998); *Ball*, 902 F.2d at 197. Moreover, the court must liberally construe, and assume the truth of, the plaintiff's uncontroverted factual allegations. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.1997); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994); *Ball*, 902 F.2d at 197.

In diversity actions, the extent of the court's personal jurisdiction is governed by New York law, as circumscribed by the Due Process Clause of the United States Constitution. *See Metro. Life Ins.*, 84 F.3d at 567; *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963). Although it is unclear from the internally

---

**53.** The Eleventh Claim seeking damages against LCC for breach of the Acuerdo will not be discussed because all claims against LCC have been voluntarily dismissed without prejudice by Delasa.

**54.** In considering a Rule 12(b)(2) motion, the court may consider affidavits and documents submitted by the parties without converting the motion into one for summary judgment under Rule 56. *See Laborers Local 17 Health and Ben. Fund v. Philip Morris, Inc.*, 26 F.Supp.2d 593, 604 (S.D.N.Y.1998).

inconsistent jurisdictional statement contained in the Second Amended Complaint, (and lack of a summary statement in Delasa's Cross-Claim), ESI's and Delasa's opposition papers reveal ·that they are asserting general jurisdiction over Coastal Salvador, Coastal Nejapa, CTS, Nejapa Power and Crystal Power (collectively the "Affiliates") [55] under C.P.L.R. § 301 or, in the alternative, specific jurisdiction under C.P.L.R. § 302(a)(1).

### A. *C.P.L.R. § 301: Doing Business by Virtue of Being a "Mere Department" of a Parent Corporation*

 Under New York law, a foreign corporation is subject to general personal jurisdiction in New York if it engages in a continuous and systematic course of "doing business" here sufficient to warrant a finding of its presence. *See Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir.1998) (standard for general jurisdiction over non-domiciliary pursuant to C.P.L.R. § 301). Courts will extend such jurisdiction over a foreign parent corporation if the jurisdictional acts of its subsidiary in New York can be imputed to the foreign parent corporation. *See Taca Int'l Airlines, S.A. v. Rolls–Royce of England, Ltd.*, 15 N.Y.2d 97, 204 N.E.2d 329, 256 N.Y.S.2d 129 (1965). The corporate veil will be pierced for jurisdictional purposes, however, only when the subsidiary is acting as an agent for the parent, or the parent's control is so complete that the subsidiary is a "mere department" of the parent. *See Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir.1996). "These tests require a fact-specific inquiry into the realities of the actual relationship between the parent and subsidiary." *Id.* Jurisdiction over the foreign subsidiary will be found only when "the activities of the parent show a disregard for the separate corporate existence of the subsidiary." *Volkswagenwerk Aktiengesellschaft v.*

*Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984).

The same rule applies to the converse situation, when à plaintiff seeks to assert personal jurisdiction over a foreign subsidiary based upon the presence of its parent. *See Public Adm'r of N.Y. County v. Royal Bank of Canada*, 19 N.Y.2d 127, 224 N.E.2d 877, 278 N.Y.S.2d 378 (1967); *Aboud v. Rapid Rentals Inc.*, No. 97 Civ. 1742(MGC), 1998 WL 132790 (S.D.N.Y. Mar.24, 1998); *Palmieri v. Estefan*, 793 F.Supp. 1182, 1188 (S.D.N.Y.1992); *DCA Food Indus. v. Hawthorn Mellody, Inc.*, 470 F.Supp. 574, 585 (S.D.N.Y.1979); *Titu–Serban Ionescu v. E.F. Hutton & Co.*, 434 F.Supp. 80 (S.D.N.Y.1977), *aff'd*, 636 F.2d 1202 (2d Cir.1980). Here, ESI and Delasa allege that the Affiliates are "mere departments" of Coastal Corp., Coastal Power and/or LCC, defendant parent corporations which have conceded that they are subject to general personal jurisdiction in New York. (*See* ESI's 2nd Amd. Compl., ¶¶ 14–22, Delasa's Cross–Claim ¶¶ 233–41).

 The Second Circuit has outlined four factors to aid in determining whether one entity is the "mere department" of another: (1) common ownership; (2) financial dependency of the subsidiary on the parent; (3) the degree to which the parent interferes in the selection of the subsidiary's executive personnel and fails to observe corporate formality; and (4) the degree of the parent's control over the subsidiary's marketing and operational policies. *Beech Aircraft*, 751 F.2d at 120– 122.

 The first factor, common ownership, is "essential to the assertion of jurisdiction over a foreign related corporation," while the other three factors are "important." *Id.* at 120. "The overall weighing of the various factors thus necessitates a balancing process, and not every factor

---

**55.** The term "Coastal Affiliates" refers only to Coastal Salvador, Coastal Nejapa, CTS and Nejapa Power.

need weigh entirely in the plaintiffs' favor." *Mayatextil, S.A. v. Liztex U.S.A., Inc.,* No. 92 Civ. 4528(SS), 1995 WL 131774, at *5 (S.D.N.Y. Mar.23, 1995) (internal quotations and citation omitted).

### 1. *Common Ownership*

This factor is easily satisfied with respect to Coastal Salvador, CTS and Crystal Power—Coastal Salvador is a wholly owned direct subsidiary of Coastal Power [56] and a wholly owned indirect subsidiary of Coastal Corp; [57] CTS is a wholly owned indirect subsidiary of Coastal Corp.; [58] and Crystal Power is a wholly owned direct subsidiary of LCC. [59] Therefore, only Coastal Nejapa and Nejapa Power need be examined more closely.

■ Coastal Nejapa is owned 90% by Coastal Salvador and 10% by Crystal Power. [60] Therefore, Coastal Corp. and Coastal Power indirectly own 90% of Coastal Nejapa. [61] The Second Circuit acknowledged in *Beech Aircraft*, however, that 100% direct ownership is not required, noting that "jurisdiction has been found in cases other than a classic parent-subsidiary relationship" and only "nearly identical ownership interests must exist." 751 F.2d at 120. *See also Levant Line, S.A. v. Marine Enters. Corp. (In re Levant Line, S.A.),* 166 B.R. 221, 232 (Bankr.S.D.N.Y.1994) ("there is not a per se rule barring suits against a foreign entity which is not a wholly owned subsidiary"). Indeed, courts have found jurisdiction when the two entities at issue ultimately share a common parent, *see Palmieri,* 793 F.Supp. at 1188.

In *Levant Line,* the court found that the New York parent company's indirect ownership interest of only 52% of the foreign

affiliate was "not sufficient to establish the nearly identical ownership interests required for personal jurisdiction under a mere department theory." 166 B.R. at 232. The court buttressed its conclusion by pointing out that the companies did not share common directors. *See id.* Coastal Corp.'s and Coastal Power's indirect ownership of 90% of Coastal Nejapa, however, is a much closer call. We believe that this level of ownership is sufficient to satisfy the nearly identical ownership requirement, especially in light of the fact that the Shareholders Agreement of Coastal Nejapa expressly acknowledged that it was "formed to own ... Nejapa Power" (Pl's Ex. FF, p. 1, ¶ A), 86.6% of the distributable cash flow of which is received by Coastal Power (1998 Form 10K).

The Affiliates claim that common ownership cannot be established with respect to Nejapa Power because it is owned .5% by Coastal Nejapa, .5% by Coastal Salvador and 99% by the 1994 El Salvador Power Trust. However, Coastal Nejapa currently leases from the Trust its 99% ownership interest in Nejapa Power (*see* Pl's Exs. OO, PP and QQ). Therefore, if we focus on the "realities of the actual relationship between the parent and subsidiary" as the Second Circuit directed in *Koehler,* 101 F.3d at 865, Coastal Nejapa has a 99.5% ownership interest in Nejapa Power which when coupled with Coastal Salvador's direct .5% ownership interest gives Coastal Salvador, and therefore Coastal Power, a 90.5% indirect ownership interest in Nejapa Power. As already stated above, this level of ownership is sufficient to establish the nearly identical ownership interest required.

---

**56.** *See* Coastal Salvador Aff. at ¶ 4.

**57.** *See* 1998 Form 10K. Coastal Power is a wholly owned direct subsidiary of Coastal Corp.

**58.** *See* Affidavit of Austin M. O'Toole as Corporate Representative of CTS submitted in support of the Affiliates' Motion to Dismiss ("CTS Aff.") at ¶ 4. CTS's immediate corpo-

rate parent is Coastal Technology, Inc. which is a wholly owned direct subsidiary of Coastal Corp. *See* 1998 Form 10K.

**59.** *See* Vilanova Aff. at ¶ 4.

**60.** *See* Coastal Nejapa Aff. at ¶ 4; *see also* 1998 Form 10K.

**61.** *See* 1998 Form 10K.

## 2. Financial Dependence

■ The second factor of financial dependency of the subsidiary on the parent corporation exists where the parent provides no- or low-interest loans to the subsidiary or extends credit on terms not otherwise available, guarantees the subsidiary's obligations, or provides and pays for insurance coverage or other necessities on behalf of the subsidiary. *See Beech Aircraft*, 751 F.2d at 121 (no-interest loans, insurance coverage); *Satcorp Int'l Group v. China Nat'l Import & Export Corp.*, 917 F.Supp. 271, 278 (S.D.N.Y.1996) (no-interest loans, profit shifting among subsidiaries); *Titu–Serban Ionescu*, 434 F.Supp. at 82 (parent guaranteed all obligations and liabilities, subsidiary given special discount by parent and derived half its income from business transactions with parent); *Rabinowitz v. Kaiser–Frazer Corp.*, 198 Misc. 707, 710–11, 96 N.Y.S.2d 642, 644 (1950), *aff'd*, 278 A.D. 584, 102 N.Y.S.2d 815 (2d Dep't), *aff'd*, 302 N.Y. 892, 100 N.E.2d 177 (1951) (parent made no-interest loans and guaranteed third-party credit). *Cf. Saraceno v. S.C. Johnson and Son, Inc.*, 83 F.R.D. 65, 69 (S.D.N.Y.1979) (not mere department where no loans guaranteed or collateralized by parent, no accounts receivable guaranteed by parent and subsidiary did not receive supplies or achieve economies through use of parent-provided materials).

Courts also inquire whether the subsidiary retains its own profits or whether they are received by and reported on the financial statements of the parent. *See DCA Food Indus.*, 470 F.Supp. at 585 (all revenue collected by subsidiary transferred to master depository account controlled by parent); *Public Adm'r*, 19 N.Y.2d at 131, 224 N.E.2d at 879, 278 N.Y.S.2d at 381 (assets and liabilities of subsidiary carried on books and records of parent); *Taca Int'l Airlines*, 15 N.Y.2d at 101, 204 N.E.2d at 330, 256 N.Y.S.2d at 131 (all of subsidiary's net income appears on balance sheet of parent); *Kossoff v. Samsung Co.*, 123 Misc.2d 177, 178, 474 N.Y.S.2d 180 (1984). *Cf. Larball Publ'g Co., Inc. v. CBS Inc.*, 664 F.Supp. 704, 707 (S.D.N.Y.1987) (no jurisdiction over subsidiaries whose "profits are their own and are not counted by CBS on its books" and parent does not issue consolidated financial statements). The issuance of consolidated financial statements, however, is not dispositive if the parent company is merely complying with SEC requirements. *See Beech Aircraft*, 751 F.2d at 121, n. 3 (SEC requires parent corporations to consolidate if parent owns more than 50% of subsidiary's stock).

Despite the fact that Coastal Corp. issues consolidated financial statements on behalf of itself and the Coastal Affiliates (*see* 1998 Form 10K), and Coastal Power receives 86.6% of the distributable cash flow from the operation of the Plant (with the remainder going to LCC), the Coastal Affiliates claim that they are not financially dependent on their respective parent companies and that they maintain their own books and records separate and distinct from their parent corporations.[62] Crystal Power does not even claim to maintain a set of books and records separate and distinct from LCC.[63] The record clearly shows, however, that the Affiliates are wholly dependent upon Coastal Corp.'s, Coastal Power's and LCC's financial support to stay in business.

In order to induce Tenneco to assign its interest in the Project to Coastal Salvador or another designated affiliate, Coastal Power had to guarantee all of the obligations of Coastal Salvador ("and/or an El Salvador limited partnership of which Coastal Salvador is the General Partner" *i.e.*, Coastal Nejapa) under the PPA.[64]

---

**62.** *See* Coastal Salvador Aff. at ¶ 6; Coastal Nejapa Aff. at ¶ 6; CTS Aff. at ¶ 6; Nejapa Power Aff. at ¶ 6.

**63.** *See* Vilanova Aff.

**64.** *See* Pl's Ex. I, the Certificate of Board of Resolution by Coastal Power, dated July 27, 1994, signed by Austin M. O'Toole as Senior Vice President and Secretary of Coastal Power.

Coastal Salvador was fully capitalized by Coastal Power, and Coastal Nejapa was subsequently fully capitalized by Coastal Power (via Coastal Salvador) and LCC. (*See* Pl's Ex. U).

Later, the issuance of Coastal Nejapa Class C shares to Crystal Power was subject to the retention of control over such shares by LCC, and LCC had to guarantee all of Crystal Power's obligations under the Certificate Purchase Agreement. (*See* Pl's Ex. KK, §§ 2.04, 2.05). Indeed, Roberto Vilanova had to pledge his entire interest in the Plant as collateral for its loan from Credit Suisse–First Boston. (*See* Pl's Exs. AA and CC).

Meanwhile, Coastal Corp. and Coastal Power authorized the expenditures to develop and construct the Plant and its expansion. (*See* Pl's Exs. D and R). The PPA was assigned to Nejapa Power on the condition that Coastal Corp. and Coastal Power guarantee all obligations and liabilities of Nejapa Power. (*See* Pl's Ex. Q). During the term of the Lease, Coastal Corp. and/or Coastal Power remain fully responsible (although the Trust holds legal title to the fixed assets of the Plant) and have guaranteed Coastal Nejapa's obligations under the Lease. (*See* Pl's Exs. V and QQ).

Finally, Coastal Corp., through its wholly owned indirect subsidiaries, CTS and Coastal Petroleum, N.V., provides for the administrative/managerial and fuel supply requirements of Nejapa Power through special long-term contracts. (*See* Pl's Exs. DD and EE; Sereno Aff. at ¶5; 1998 Form 10K). Undoubtedly, the operation and existence of the Affiliates is dependent upon the financial support of Coastal Corp., Coastal Power and LCC.

**65.** *See, e.g.,* 1998 Form 10K; Pl's Exs. H, I and J. The Court also takes judicial notice of all relevant public records filed in the U.S. with respect to the domestic affiliates of Coastal Corp. What, if any, position he holds with Coastal Nejapa, Nejapa Power or CTS is not in evidence.

### 3. *Executive Selection and Corporate Formalities*

■ In examining the third factor, interference with executive personnel and failure to observe corporate formalities, courts look to, *inter alia,* whether the parent shares officers with the subsidiary and shifts executives among its subsidiaries, whether the parent pays the executives' salaries, and whether the subsidiary holds separate meetings of its Board of Directors, *see Beech Aircraft,* 751 F.2d at 121–22 (subsidiary's officers appointed, controlled and paid by parent, no independent board meetings); *Public Adm'r,* 19 N.Y.2d at 132, 224 N.E.2d at 879, 278 N.Y.S.2d at 381–82 (employees assigned and shifted among subsidiaries by parent); *Taca Int'l Airlines,* 15 N.Y.2d at 101, 204 N.E.2d at 331, 256 N.Y.S.2d at 131 (shared officers and directors); *Rabinowitz,* 198 Misc. at 711, 96 N.Y.S.2d at 645 (parent paid salaries of certain officers).

In the instant case, there is massive overlap of corporate officers and directors between the parents and subsidiaries: (1) *David Arledge* is the Chairman of the Board, President and Chief Executive Officer of Coastal Corp., and at all relevant times was Chairman of the Board of Coastal Power and Coastal Salvador; [65] (2) *Robert C. Hart* was, at all relevant times, Vice President of Coastal Corp., and President of Coastal Power, Coastal Salvador, Coastal Nejapa, Coastal Technology, Inc. (parent company of CTS) and CTS; [66] (3) *Austin M. O'Toole* is the Senior Vice President and Secretary of Coastal Corp., Coastal Power, Coastal Salvador, Coastal Nejapa, Coastal Technology, Inc. and CTS; [67] (4) *Donald H. Gullquist* is Senior

**66.** *See, e.g.,* Pl's Exs. A, E, H, I, J, L, DD, EE, FF, KK, OO and RR. What, if any, position he holds with Nejapa Power is not in evidence.

**67.** *See, e.g.,* 1998 Form 10K; Coastal Salvador Aff. at ¶2; Coastal Nejapa Aff. at ¶2; CTS Aff. at ¶2; Pl's Exs. H, I and J. What, if any, position he holds with Nejapa Power is not in evidence.

Vice President of Coastal Corp., Coastal Power, Coastal Salvador, Coastal Nejapa, Coastal Technology, Inc. and CTS; [68] (5) *James W. Gray* is Vice President of Coastal Technology, Inc., Senior Vice President of Coastal Nejapa and Vice President of Nejapa Power; [69] and (6) *Roberto Vilanova* is President (and principal stockholder) of both LCC and Crystal Power.[70]

Further, Coastal Corp. pays most, if not 100%, of the salaries and bonuses of Arledge, Hart, O'Toole, Gullquist and Gray and provides them with additional perquisites such as Coastal Corp. stock options and contributions to the Coastal Corp. Thrift and Pension Plans.[71] It also appears from the record that Vilanova receives his entire compensation from LCC as Crystal Power is merely a holding company with no employees whatever.[72]

Although ESI and Delasa adequately pleaded the failure of the Affiliates to observe corporate formalities, they recognize that, to date, the defendants have not produced any documents or information that support such allegations. Moreover, Austin M. O'Toole has submitted affidavits on behalf of Coastal Salvador, Coastal Nejapa, Nejapa Power and CTS which affirm that each subsidiary conducts its own board of directors meetings and otherwise observes corporate formalities separate and apart from its respective parent or member corporations.[73]

However, statements to this effect are notably absent in Roberto Vilanova's Affidavit on behalf of Crystal Power, which is in all other material respects identical to those submitted by O'Toole. In addition,

as shown above, Coastal Corp., Coastal Power and LCC participate in their subsidiaries' selection of executive personnel. In any event, ESI and Delasa need not prove that the Affiliates disregard corporate formalities in order to establish a prima facie showing that they are "mere departments" of Coastal Corp., Coastal Power and/or LCC. *See Aboud,* 1998 WL 132790, at *3. The majority of considerations relevant to the third factor weigh heavily in favor of exercising jurisdiction.

### 4. Control of Marketing and Operational Policies

█ The fourth factor regarding the parent's degree of control over the marketing and operational policies of the subsidiary is satisfied where the parent's promotional materials or public documents hold out the subsidiary as a branch or division of the parent, or the parent determines the subsidiary's operational policies and strategy. *See Boryk v. deHavilland Aircraft Co.,* 341 F.2d 666, 668 (2d Cir. 1965) (subsidiary listed as branch of parent on letterhead); *Public Adm'r,* 19 N.Y.2d at 131–32, 224 N.E.2d at 879, 278 N.Y.S.2d at 381–82 (subsidiary referred to as branch of parent and used documents and forms standardized and prescribed by parent); *Taca Int'l Airlines,* 15 N.Y.2d at 101, 204 N.E.2d at 330, 256 N.Y.S.2d at 131–32 (personnel trained by parent, parent determined business policies, set prices, issued warranties and prepared marketing materials).

Contrary to the Affiliates' assertion, the record is replete with evidence that the

---

68. *See, e.g.,* 1998 Form 10K; Pl's Exs. MM and QQ. What, if any, position he holds with Nejapa Power is not in evidence.

69. *See, e.g.,* Pl's Exs. Q, LL and MM. What, if any, position he holds with Coastal Salvador is not in evidence.

70. *See, e.g.,* Vilanova Aff. at ¶ 2; Pl's Exs. Y, AA, BB, CC, FF, JJ, KK and RR.

71. *See* 1998 Form 10K and Coastal Proxy Statement for the May 6, 1999 Annual Meeting of Shareholders referenced therein.

These individuals are certainly not compensated by each of the subsidiaries in which they hold executive offices (which, in some cases, number over one hundred).

72. *See* Vilanova Aff. at ¶ 5 and 7.

73. *See* Coastal Salvador Aff. at ¶¶ 5 and 7; Coastal Nejapa Aff. at ¶¶ 5 and 7; Nejapa Power Aff. at ¶¶ 5 and 7; CTS Aff. at ¶¶ 5 and 7.

Affiliates are merely holding companies formed to finance, own, operate and manage the Project for Coastal Power and LCC. The Affiliates themselves confirmed this many times over with admissions such as: "Coastal Salvador[ ] is a holding company involved exclusively in the financing of the Nejapa Power plant" (Coastal Salvador Aff. at ¶ 8); "[Coastal Nejapa] has been formed to own ... Nejapa Power" (Pl's Ex. FF, p. 1, ¶ A); "Nejapa Power is the project company for the Nejapa Power plant" (Nejapa Power Aff. at ¶ 8); "[CTS] Provides operations, maintenance, and business management services to Nejapa Power[ ]" (CTS Aff. at ¶ 8); and "Crystal Power [ ] is a holding company involved in the ownership of the Nejapa Power plant" (Vilanova Aff. at ¶ 5).

Coastal Corp., Coastal Power and LCC exercise complete control over the policies and operation of the Affiliates. From its inception, LCC was involved with the development of the Project and acted as the host company in El Salvador. When Coastal Corp. decided to invest in the Project, it was Coastal Power that performed all the necessary due diligence and negotiated with Tenneco and LCC. The ownership structure and financing arrangements for the Project were also established by Coastal Power which then "caused various affiliated companies to acquire the Project" (Pl's Ex. S). But the control of Coastal Power and LCC did not end there.

Coastal Corp. had always intended to maintain control over the day-to-day operations of the Plant both through Coastal Power,[74] and CTS. In conferences between the common executives, the policies for Coastal Salvador, Coastal Nejapa, Nejapa Power and CTS are formed. Indeed, the Administrative Services Agreement which gave CTS managerial control over Nejapa Power, was negotiated and executed by Robert C. Hart on behalf of both parties and, in the perfect culmination of this incestuous transaction, CTS signed the agreement on behalf of Nejapa Power as its "Manager." Coastal Corp. also arranged for another subsidiary, Coastal Petroleum, N.V., to provide fuel to Nejapa Power.

Numerous other agreements required the actual participation and consent of Coastal Corp. and LCC, including the First Amendment to the Amended and Restated Lease,[75] Memo of Understanding[76] and Consent and Agreement between Coastal Salvador, Coastal Nejapa, Crystal Power, LCC and Credit Suisse.[77] In addition, all implementing and ownership agreements require notices for Coastal Salvador, Coastal Nejapa, and Nejapa Power to be sent to Coastal Corp., all notices for CTS to be sent to Coastal Technology, Inc. (a wholly owned subsidiary of Coastal Corp.), and all notices for Crystal Power to be sent in care of LCC.[78]

Moreover, in the Subscription Agreement entered into between Crystal Power, LCC, Coastal Salvador and Coastal Nejapa, LCC covenanted that, at all relevant times, *it would retain the power to vote all Class A and Class C shares issued to Crystal Power* and would cause Crystal Power to perform all of its obligations under the Certificate Purchase Agreement.

Although numerous corporate entities have been formed by Coastal Corp., only

---

74. *See* Pl's Ex. U, a letter from Coastal Power to LCC whereby Coastal Power states its intent "to be responsible for the day to day management of the business of the Project Company."

75. *See* Pl's Ex. QQ, executed by Donald H. Gullquist as Senior Vice President of Coastal Corp., Coastal Nejapa and CTS in its capacity as Manager of Nejapa Power.

76. *See* Pl's Ex. BB, signed by Robert C. Hart on behalf of Coastal Salvador (and Coastal Power which had to consent to the agreement), and by Roberto Vilanova on behalf of Crystal Power (and LCC which had to consent to the agreement).

77. *See* Adams Aff. at ¶ 8.

78. *See* Pl's Exs. DD, FF, KK and RR.

one commonly owned enterprise exists, that is Coastal Corp.'s operation of a power plant in El Salvador which, in order to survive requires the joint endeavors of Coastal Power, Coastal Salvador, Coastal Nejapa, CTS and Nejapa Power. Each Coastal Affiliate is an "integral part of a united endeavor" such that they are acting as "mere departments" of Coastal Corp. and Coastal Power. *Freeman v. Gordon & Breach Science Publishers, Inc.*, 398 F.Supp. 519, 522 (S.D.N.Y.1975); *see also Satcorp Int'l Group*, 917 F.Supp. at 279; *DCA Food Indus.*, 470 F.Supp. at 585; *Titu–Serban Ionescu*, 434 F.Supp. at 82; *Kossoff*, 123 Misc.2d at 178, 474 N.Y.S.2d at 180.

Upon weighing the relevant factors, we conclude that the Affiliates are subject to personal jurisdiction in New York pursuant to C.P.L.R. § 301 because they are acting as "mere departments" of Coastal Corp., Coastal Power and LCC, corporations which are concededly present in New York.

### B. *C.P.L.R. § 302(a)(1): Transacting Business in New York*

 ESI and Delasa also assert specific personal jurisdiction over the Affiliates pursuant to C.P.L.R. § 302, New York's long-arm statute. C.P.L.R. § 302(a)(1) provides for personal jurisdiction "over any non-domiciliary . . . who in person or through an agent transacts any business within the state," provided that the cause of action arises therefrom. The showing necessary for a finding that a defendant "transacted business" under § 302(a)(1) is considerably less onerous than that required for a finding that a defendant was "doing business" under § 301. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985). However, as interpreted by the New York Court of Appeals, the exercise of jurisdiction under this provision will comport with the due process guarantees only if " 'the defendant purposefully avails itself of the privilege of conducting activi-

ties within [New York], thus invoking the benefits and protections of its laws.' " *McKee Elec. Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 382, 229 N.E.2d 604, 607, 283 N.Y.S.2d 34, 38 (1967) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *accord Cut-Co Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986).

 To determine whether a party has "transacted business" within the meaning of § 302(a)(1), courts look at the "totality of the circumstances" and consider, *inter alia*, the following factors: (1) whether the defendant has an ongoing contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York; (3) whether the contract contains a New York choice-of-law, forum-selection or consent to jurisdiction clause; and (4) whether the contract requires notices or payments to be sent to New York or requires supervision by the corporation in New York. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996); *Nat'l Tel. Director Consultants, Inc. v. Bellsouth Adver. & Publ'g Corp.*, 25 F.Supp.2d 192, 195 (S.D.N.Y. Oct.27, 1998) *Falik v. Smith*, 884 F.Supp. 862, 866 (S.D.N.Y. 1995); *Benjamin Sheridan Corp. v. Benjamin Air Rifle, Co.*, 827 F.Supp. 171, 175 (W.D.N.Y.1993).

The Affiliates claim that they have not "transacted business" in New York because they: (1) were not incorporated (or, in the case of Nejapa Power, organized) in New York; (2) are neither qualified, licensed nor authorized to engage in business in New York; (3) maintain no offices, mailing address or telephone listing in New York; (4) have no agents, representatives, officers or employees in New York; (5) keep no corporate records in New York; (6) have never held a board of directors' or shareholders' meeting in New York; (7) have never solicited business nor sold any products or services in New York; and (8) have never entered into a contract

for specific performance in New York.[79] Coastal Nejapa and Crystal Power also claim that they do not maintain bank accounts in New York.[80]

For the most part, ESI and Delasa do not challenge such representations on behalf of the Affiliates; however, they do take strong exception to the assertions regarding agents, the solicitation of business in New York and the Affiliates' contractual ties to New York.

### 1. *Coastal Salvador*

■ Coastal Salvador, the entity chosen by Coastal Corp. and Coastal Power to initially receive Tenneco's interest in the Project, acquired such interest pursuant to the Purchase Agreement dated July 29, 1994. Coastal Salvador has admitted that the Purchase Agreement was partially negotiated over the telephone with Tenneco's counsel in New York. Also in connection therewith, Coastal Salvador executed an Assignment and Assumption of the Turnkey Contract. The Turnkey Contract requires all payments to be made by wire transfer to Citibank, N.A. in New York and contains a New York choice-of-law clause. According to Coastal Salvador, the Assignment and Assumption Agreement was also partially negotiated by telephone with Tenneco's counsel in New York.

In connection with the financing and ownership of the Plant, Coastal Salvador executed at least eleven agreements, including: (1) the Shareholders Agreement of Coastal Nejapa; (2) the Amended and Restated Shareholders Agreement; (3) Amendment No. 1 to the Amended and Restated Shareholders Agreement; (4) the Second Amendment to the Amended and Restated Shareholders Agreement; (5) the Third Amendment to the Amended and Restated Shareholders Agreement; (6) the Subscription Agreement; (7) the Amended and Restated Subscription Agreement; (8) Amendment No. 1 to the Amended and Restated Subscription Agreement; (9) the Second Amendment to the Amended and Restated Subscription Agreement; (10) the Certificate Purchase Agreement; and (11) the Amended and Restated Certificate Purchase Agreement.

Each of these agreements contains the Forum Selection Clause or retains the identical provision from the former agreement. Further, the Certificate Purchase Agreement was partially negotiated by telephone and facsimile correspondence to New York.

The financing for the Project was obtained by soliciting funds from New York banks which subsequently bought into the 1994 El Salvador Power Trust. All payments made by CEL under the PPA are sent to Citibank, N.A. in New York which in turn distributes the income to Coastal Salvador. Coastal Salvador also maintains a bank account in New York.

Finally, in connection with the expansion, and Crystal Power's purchase of additional Class C shares in Coastal Nejapa, Coastal Salvador also entered into the Consent and Agreement with Coastal Nejapa, Crystal Power, LCC and Credit Suisse–First Boston in New York. Coastal Salvador admits taking part in negotiations by telephone and facsimile with Credit Suisse–First Boston in New York.

Under these circumstances, we find that Coastal Salvador has transacted business in New York within the meaning of C.P.L.R. § 302(a)(1). Coastal Salvador has placed numerous telephone calls and has sent many letters and facsimiles to New York to negotiate several key agreements listed above. It has entered into several agreements which contain not only New York choice-of-law provisions, but New York forum selection and consent to jurisdiction and venue clauses. Indeed, it

---

79. *See* Coastal Salvador Aff. at ¶¶ 3, 9–15; Coastal Nejapa Aff. at ¶¶ 3, 9–15; Nejapa Power Aff. at ¶¶ 3, 9–15; CTS Aff. at ¶¶ 3, 9–15; Vilanova Aff. at ¶¶ 3, 6–20.

80. *See* Coastal Nejapa Aff. at ¶ 15(b); Vilanova Aff. at ¶ 13.

assumed the obligations of the Turnkey Contract which required specific performance on the part of Coastal Salvador in New York.

In their Reply Memorandum, the Affiliates analyze each New York contact separately and argue that: (1) telephone calls and correspondence sent to New York will not, by themselves, confer jurisdiction; (2) a New York choice-of-law provision is, by itself, insufficient to confer jurisdiction; (3) maintenance of a New York bank account does not, without more, amount to "doing business;" (4) use of New York banks to structure a lease involving property in El Salvador does not suffice to establish jurisdiction; and (5) the wiring of payments to New York does not establish the requisite purposeful activity.

First, the Affiliates improperly analyze each contact as if it were the defendant's sole contact (*i.e.,* "standing alone, is insufficient"), whereas we are directed by the Second Circuit to look at "the totality of the circumstances." *See Agency Rent A Car Sys.,* 98 F.3d at 29. The aggregate of Coastal Salvador's forum contacts is "qualitatively" significant: solicitation of business in New York, maintenance of a bank account in New York, negotiation of agreements in New York by telephone and facsimile; contracts requiring specific performance in New York and/or containing the Forum Selection Clause.

Second, although not dispositive, New York choice-of-law provisions are significant considerations under a "transacting business" analysis. *See CutCo Indus.,* 806 F.2d at 366–67; *Sacody Technologies v. Avant, Inc.,* 862 F.Supp. 1152, 1156 (S.D.N.Y.1994). Further, in holding that New York choice-of-law provisions are insufficient, on their own, to convey personal jurisdiction over a defendant, the courts have always been careful to contrast such provisions with forum-selection or consent to jurisdiction clauses. *See, e.g., Agrashell, Inc. v. Bernard Sirotta Co.,* 344 F.2d 583, 588 (2d Cir.1965) ("The choice of law provision cannot be construed as a volun-

tary submission by [defendant] to the personal jurisdiction of the New York courts in the absence of any express contractual understanding to that effect").

Conspicuously absent from the Affiliates' memoranda (and understandably so) is any recognition or discussion of the forum-selection and waiver of objections to jurisdiction and venue provisions in the ownership agreements. We, however, cannot ignore that the Affiliates have consented to the jurisdiction and venue of this Court with respect to any disagreement over their respective ownership rights in the Plant. Were ESI or Delasa a party to such agreements, the Affiliates' motion to dismiss would be sanctionable. However, the very reason for the instant action is that ESI and Delasa are not parties to these agreements, and the agreements provide for the distribution of 100% of the income from the Plant to the exclusion of ESI and Delasa.

With respect to the maintenance of a New York bank account, the Affiliates rely on *Grove Valve & Regulator Co. v. Iranian Oil Servs. Ltd.,* 87 F.R.D. 93 (S.D.N.Y. 1980) for the proposition that maintenance of a local bank account does not, without more, amount to "doing business" in the state, and assert that *Grove* "is dispositive of this case." In so arguing, the Affiliates have failed to recognize the critical distinction between C.P.L.R. § 301's "doing business" standard and the significantly lesser standard of "transacting business" under C.P.L.R. § 302. ESI and Delasa are correct in asserting that the maintenance of a bank account in New York constitutes the transaction of business within the meaning of C.P.L.R. § 302(a)(1) provided that the cause of action arises out of the maintenance of such account. *See Masonite Corp. v. Hellenic Lines, Ltd.,* 412 F.Supp. 434, 438 (S.D.N.Y.1976); *Tarrab v. Tarrab,* 239 A.D.2d 263, 657 N.Y.S.2d 674 (1st Dep't 1997).

The case cited by the Affiliates, *Nat'l Spinning Co. v. Talent Network, Inc.,* 481

F.Supp. 1243, 1246–47 (S.D.N.Y.1979), in which the court refused to exercise jurisdiction over a defendant solely on the basis of his attorney's negotiation of minor terms and reducing to writing a bargain which had already been struck in another jurisdiction, in no way counsels against the exercise of jurisdiction in the case at bar. Rather, this case is more akin to *Bankers Trust Co. v. Nordheimer,* 746 F.Supp. 363 (S.D.N.Y.1990) where the court found that the defendants who had, *inter alia,* sought out a New York bank to obtain financing for a joint venture in which they maintained a 50% interest engaged in sufficient purposeful activity in New York to constitute the transaction of business within the meaning of C.P.L.R. § 302(a)(1).

Finally, the Affiliates argue that the wiring of payments into New York does not establish the requisite purposeful activity to justify the exercise of personal jurisdiction under C.P.L.R. § 302(a)(1). The cases cited by the Affiliates, however, involve the wiring of payments to New York by the defendant as a "passive accommodation" to the plaintiff, rather than a contractual obligation. *See Continental Field Serv. Corp. v. ITEC Int'l, Inc.,* 894 F.Supp. 151, 154 (S.D.N.Y.1995); *Colson Services Corp. v. Bank of Baltimore,* 712 F.Supp. 28, 31 (S.D.N.Y.1989); *see also Wirth v. Prenyl, S.A.,* 29 A.D.2d 373, 375, 288 N.Y.S.2d 377, 379 (1st Dep't 1968) (declining to find jurisdiction where no commercial benefit accrued to defendants by fixing the place of payment in New York, and protection of New York laws was not bargained for). Although on its own insufficient to establish jurisdiction, a *contractual requirement* to send payments to New York is significant for purposes of a § 302(a)(1) analysis and, when coupled with the maintenance of a New York bank account or choice-of-law provision, will constitute the transaction of business. *See, e.g., Lancaster v. Zufle,* 165 F.R.D. 38 (S.D.N.Y.1996); *Catalyst Energy Dev. Corp. v. Iron Mountain Mines, Inc.,* 630 F.Supp. 1314 (S.D.N.Y.1986).

Taking into account the totality of the circumstances, Coastal Salvador has transacted business in New York within the meaning of § 302(a)(1).

### 2. *Coastal Nejapa*

Whether directly (as a signatory) or indirectly (as the subject corporation), Coastal Nejapa is a party to all of the ownership and financing agreements discussed above with respect to Coastal Salvador and equally engaged in the solicitation of financing from the New York banks. We, therefore, incorporate all of the resulting New York contacts analysis set forth above into our discussion of Coastal Nejapa's transaction of business in New York. Here too, all payments made by CEL under the PPA are sent to Citibank, N.A. in New York which in turn distributes the income to Coastal Nejapa in accordance with Coastal Nejapa's .5% direct interest and additional 99% leased interest in Nejapa Power.

This brings us to an additional contact with New York on behalf of Coastal Nejapa not present with respect to Coastal Salvador—the Lease. Coastal Nejapa entered into the Lease Agreement, Amended and Restated Lease, and First Amendment to the Amended and Restated Lease with State Street Bank and Trust, as Trustee under the Declaration of Trust, each of which contains the Forum Selection Clause and contractually requires Coastal Nejapa to make all payments of "rent" to Citibank, N.A. in New York. Moreover, Coastal Nejapa admits that the Lease was partially negotiated through telephone calls and facsimiles sent to New York. Accordingly, Coastal Nejapa has also engaged in sufficient purposeful acts in New York to subject itself to jurisdiction here pursuant to C.P.L.R. § 302(a)(1).

### 3. *Nejapa Power*

Nejapa Power was largely financed (99%) by New York banks which purchased an ownership interest in the 1994 El Salvador Power Trust. All ownership

rights in the Project received by Coastal Salvador from Tenneco were ultimately transferred, and the PPA was assigned, to Nejapa Power. As discussed above, all payments by CEL for the purchase of energy under the PPA are made to Nejapa Power's bank account at Citibank, N.A. in New York. This New York bank account "receive[s] all revenues and pay[s] the operating expenses of Nejapa Power ... [and is also] the bank account from which Nejapa Power[ ] remits distributions" to Coastal Salvador, Coastal Nejapa and the Trust (Sereno Aff. at § 4).

Of course, Nejapa Power is also a party to the Lease Agreement, Amended and Restated Lease, and First Amendment to the Amended and Restated Lease which contain the Forum Selection Clause and were partially negotiated in New York via telephone and facsimile. In addition, Nejapa Power entered into the Administrative Services Agreement and the Amended and Restated Administrative Services Agreement with CTS both of which contain New York forum-selection and consent to jurisdiction and venue provisions.

Accordingly, we conclude that Nejapa Power has transacted business in New York within the meaning of C.P.L.R. § 302(a)(1).

### 4. CTS

Pursuant to the Administrative Services Agreement and the Amended and Restated Administrative Services Agreement discussed above, CTS was given complete control over the management and operation of Nejapa Power. The import of the forum-selection and consent to jurisdiction and venue provisions in these agreements need not be repeated here. CTS also maintains a bank account in New York through which it undoubtedly receives funds from Nejapa Power and may even transact business on behalf of Nejapa Power, as its Manager. Although CTS's contacts with New York are the least compelling of all the Affiliates', we believe that CTS has sufficiently availed itself of the benefits of New York laws such that we may exercise jurisdiction over it under C.P.L.R. § 302(1)(a).

### 5. Crystal Power

The evidence of Crystal Power's transaction of business in New York is by far the most substantial. Crystal Power is a party to all of the ownership and financing agreements discussed above with respect to Coastal Salvador and we hereby incorporate the relevant legal analysis. In addition, Crystal Power solicited financing from Credit Suisse–First Boston in New York in order to purchase the Class C shares in Coastal Nejapa. In connection therewith, Crystal Power executed: (1) the Security and Pledge Agreement; (2) Amended and Restated Security and Pledge Agreement; (3) Term Trust Certificate; and (4) Consent and Agreement.

Addressing these documents in reverse order, the Consent and Agreement was partially negotiated by Crystal Power via telephone and facsimile communications with Credit Suisse–First Boston in New York. The Term Trust Certificate contains a New York choice-of-law clause.

The Security and Pledge Agreement, and Amended and Restated Security and Pledge Agreement were negotiated in part over the telephone and through facsimile transmissions to New York. Both contain the Forum Selection Clause. Further, pursuant to Section 7 of the Amended and Restated Security and Pledge Agreement, Crystal Power established a collateral account and a reserve account with Credit Suisse–First Boston in New York. The same agreement also required Crystal Power to designate Credit Suisse–First Boston in New York as its attorney-in-fact, authorizing it "to take any action, to execute any instruments and to exercise any rights, privileges, options, elections or powers of [Crystal Power]" deemed necessary with respect to the bank collateral (i.e., Crystal Power's pledged Class A and C shares of Coastal Nejapa).

It is therefore with complete assurance that we conclude that Crystal Power has "transacted business" in New York sufficient to establish jurisdiction under C.P.L.R. § 302(1)(a).

■ The Affiliates nevertheless contend that ESI's and Delasa's causes of action do not arise from the transactions enumerated above. A cause of action arises out of activities in New York if there is an "articulable nexus" or a "substantial relationship" between the claim asserted and the activities that occurred in New York. *See Kronisch,* 150 F.3d at 130; *Agency Rent A Car Sys.,* 98 F.3d at 31; *Sacody Technologies,* 862 F.Supp. at 1155; *McGowan v. Smith,* 52 N.Y.2d 268, 419 N.E.2d 321, 437 N.Y.S.2d 643 (1981). "There is no requirement that jurisdiction be grounded upon either the final act or the ultimate act causing the injury. It is sufficient if the cause of action is related to and grows out of the transaction of business in New York." *Legros v. Irving,* 38 A.D.2d 53, 56, 327 N.Y.S.2d 371 (1st Dep't 1971) (defamation action sufficiently related where all significant actions culminating in publication of defamatory book occurred in New York).

■ ESI and Delasa seek a declaratory judgment as to their respective ownership interests in the Project and the income from the Plant, and assert causes of action against the Affiliates for, *inter alia,* breach of the Three–Party Agreement, tortious interference with the Three–Party Agreement, breach of fiduciary duty, tortious interference with the Delasa–ESI assignment, unjust enrichment, promissory estoppel and fraud. They also seek an accounting and the imposition of a constructive trust with respect to the Plant's income and expenses and their proportionate shares of the Plant's net income. Clearly, the above business transactions have given rise to such claims.

All of the ownership rights in the Project and subsequent income from the Plant which lie at the heart of the controversy before this Court, were conferred upon the Affiliates by and through the agreements described above. ESI's and Delasa's claims are directly related to the revenue flowing in and out of the New York bank accounts pursuant to the terms of the Lease and Trust related agreements— funds which are ultimately distributed to the Affiliates (to the exclusion of ESI and Delasa) pursuant to the terms of the ownership and sharing agreements.

Each of the above mentioned transactions "share the quality of being directed at obtaining or keeping" 100% of the ownership interests in the Project and income from the Plant for the Affiliates' and denying ESI and Delasa their claimed interests in the same. *Hedlund v. Products From Sweden, Inc.,* 698 F.Supp. 1087, 1092 (S.D.N.Y.1988) (articulable nexus found between Swedish corporation's activities in New York and alleged tortious inference with plaintiff's exclusive distributorship agreement). Clearly, ESI's and Delasa's claims are substantially related to, and thus arise out of, the Affiliates' forum-related activities.

Therefore, ESI and Delasa have made a prima facie showing under C.P.L.R. § 302(1)(a) as an alternative basis for exercising personal jurisdiction over the Affiliates.

■ Finally, we conclude that the exercise of personal jurisdiction over the Affiliates would comport with the requirements of the Due Process Clause because they have purposely availed themselves of the laws and courts of New York and, in light of the numerous agreements containing the Forum Selection Clause, cannot be surprised at being hailed into court here. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 480–82, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The fact that ESI and Delasa are not parties to such agreements does not offend "traditional notions of fair play and substantial justice." [81]

---

**81.** The Affiliates argument to the contrary is unpersuasive. The Supreme Court has made

Rather, the Affiliates anticipated and expressly agreed to litigate the issue of their respective ownership rights in the Project here in New York.

Accordingly, their motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) are denied.

## II. *Forum Non Conveniens*

■ In 1998, this Court denied Coastal Power's motion to dismiss ESI's Amended Complaint on the ground of *forum non conveniens. See ESI I*, 995 F.Supp. at 425–29. Now, Coastal Power has joined with Coastal Corp. and the Affiliates' in motions to dismiss ESI's Second Amended Complaint and Delasa's Cross–Claim on the ground of *forum non conveniens,* despite this Court's previous ruling and subsequent warnings concerning the strictures of Fed.R.Civ.P. 11. For the reasons discussed below, the motions are denied.

■ There is a strong presumption in favor of the plaintiff's chosen forum, which will be upset only if the defendants can demonstrate: (1) that an adequate alternative forum exists; and (2) that, considering relevant private and public interest factors, the balance of convenience tips strongly in favor of trial in the alternative forum. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 290 (2d Cir.1996); *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2d Cir. 1991).

### A. *Existence of Adequate Alternative Forum*

In *ESI I*, we held that Coastal Power had failed to demonstrate the existence of an adequate alternative forum where *all* defendants would be subject to jurisdiction by failing to address whether the El Salvadoran courts would have personal jurisdiction over Delasa by consent or otherwise. 995 F.Supp. at 426.

ESI and Delasa have since named seven additional defendants/cross-defendants: (1) Trigen, a Delaware corporation with its principal place of business in New York;[82] (2) Tenneco, a Texas corporation with its principal place of business in Texas; (3) Coastal Corp., a Delaware corporation with its principal place of business in Texas; (4) Coastal Salvador, a Cayman Islands corporation with principal places of business in Texas and El Salvador; (5) Coastal Nejapa, a Cayman Islands corporation with principal places of business in Texas and El Salvador; (6) Nejapa Power, a Delaware limited liability company with principal places of business in Texas and El Salvador; (7) CTS, an El Salvadoran corporation with principal places of business in Texas and El Salvador; and (8) Crystal Power, a Bahamian corporation with principal places of business in the Bahamas and El Salvador.

If anything, these new defendants make it far less likely that El Salvador is an adequate alternative forum. Although Coastal Corp. would certainly consent to jurisdiction, and the Affiliates would be subject to jurisdiction by virtue of their doing business in the forum, there is no indication that Delasa, Trigen and Tenneco would be subject to, or consent to, jurisdiction in El Salvador.[83] Moreover, the requirement that *all* defendants remaining in the action be subject to the jurisdiction of

---

abundantly clear that the plaintiff's contacts are irrelevant in the Due Process analysis—the court must determine only whether the defendant has had sufficient "minimum contacts" with the forum. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Hanson,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283.

**82.** Although ESI and Delasa subsequently dismissed their claims against Trigen, it is a relevant party because cross-claims brought by Coastal Power and Tenneco against Trigen remain extant.

**83.** Again, although ESI has subsequently dismissed its claims against Delasa, it remains a relevant party because Delasa is still named as a cross-defendant.

the proposed alternative forum has since been reaffirmed by the Court of Appeals for the Second Circuit. *See Jota v. Texaco, Inc.,* 157 F.3d 153, 159 (2d Cir.1998) (in order to grant motion to dismiss for *forum non conveniens,* court must satisfy itself that subject litigation may be conducted elsewhere against all defendants).

Even if Delasa, Trigen and Tenneco were somehow subject to jurisdiction in El Salvador, the balance of private and public factors still do not tip strongly in favor of trial there.

### B. *Private and Public Interest Factors*

 In determining whether "the convenience of the parties and the ends of justice would be best served by dismissing the action," the Court must balance a variety of private and public interests. *Murray,* 81 F.3d at 293. The private interest factors, as set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) the need, if any, to view the premises at issue; (5) the enforceability of a judgment; and (6) all other practical problems that make trial of a case easy, expeditious, and inexpensive; the relevant public interest factors include: (7) the administrative difficulties flowing from court congestion; (8) interest in having localized controversies decided at home; (9) the unfairness of burdening citizens in an unrelated forum with jury duty; and (10) the forum's familiarity with governing law, and the avoidance of unnecessary conflict of law problems (the "Gilbert factors"). The strong presumption in favor of plaintiff's choice of forum is not overcome unless the balance of these private and public factors weighs heavily in favor of trial in the alternative forum. *R. Maganlal & Co.,* 942 F.2d at 167–68.

### 1. *Relative Ease of Access to Sources of Proof*

Coastal Corp., Coastal Power and the Affiliates assert that "with the addition of the five new foreign defendants, whose alleged injurious actions took place in El Salvador, whose key corporate documents are located in El Salvador, and whose key witnesses reside in El Salvador," the balance of private interest factors tips strongly in favor of an El Salvador forum. *See* Affiliates' Mem. at p. 16. However, the Affiliates' own affidavits reveal that this paragraph is replete with misstatements and half-truths.

ESI and Delasa have added as defendants/cross-claim defendants four domestic entities, two Cayman Islands corporations, one Bahamian corporation and one El Salvador corporation, with six such defendants having a "nerve center" and principal place of business in Texas. The record clearly shows that the majority of the defendants' allegedly injurious conduct took place in Texas, with additional activities taking place in New York and El Salvador.

By their own admissions: (1) Coastal Salvador's "officers and directors . . . reside and work in El Salvador and Houston, Texas" and its "corporate documents . . . are located in the Cayman Islands and Houston, Texas" (Coastal Salvador Aff. at ¶¶ 10, 11); (2) Coastal Nejapa's "officers and directors . . . reside and work in the Cayman Islands, El Salvador, and Houston, Texas" and its "corporate documents . . . are located in the Cayman Islands and Houston, Texas" (Coastal Nejapa Aff. at ¶¶ 10, 11); (3) Nejapa Power's "officers and directors . . . reside and work in El Salvador and Houston, Texas" and its "corporate documents . . . are located in . . . El Salvador and Houston, Texas" (Nejapa Power Aff. at ¶¶ 10, 11); (4) CTS's "corporate officers and directors . . . reside and work in El Salvador and Houston, Texas" (CTS Aff. at ¶¶ 10); and (5) Crystal Power's officers, directors and corporate documents are located in the Bahamas and El Salvador (Vilanova Aff. at ¶¶ 6, 7).

As we noted in *ESI I*, the documents most relevant to ESI's and Delasa's claims are either located in the United States or, as evidenced by the attachments to the parties' motion papers, can be easily obtained. Moreover, these documents either were executed in English or have already been translated into English.

Once again, the movants have failed to substantiate the contention that their "key witnesses reside in El Salvador." Although Roberto Vilanova, the key witness on behalf of Crystal Power and LCC, resides in El Salvador, as shown in the "mere department" analysis above, most if not all of the officers and directors of Coastal Salvador, Coastal Nejapa, Nejapa Power and CTS are identical and all reside and work in Houston, Texas. Moreover, the attorneys who apparently represented these entities in connection with the negotiation and drafting of the ownership and Trust agreements at issue (one of which, interestingly enough, is counsel for Coastal Corp.) also reside and/or work in Texas. *See* Wasmuth Aff. and Adams Aff. Indeed, every affidavit submitted on behalf of the Affiliates, with the obvious exception of the Vilanova Affidavit, were executed by individuals in Texas—four of which were executed by one man, Austin M. O'Toole.[84]

Therefore, whether this case proceeds in New York or El Salvador, witnesses would be required to travel internationally. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46–7 (2d Cir.1996); *WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F.Supp. 734, 750 (S.D.N.Y.1997). As between New York and El Salvador, locating this action in the former forum would still appear to impose a lesser travel burden on the necessary witnesses.

#### 2. *Availability of Compulsory Process*

As neither party has claimed that the testimony of any critical witness will be unavailable in either forum, this factor does not weigh in favor of dismissal. *See Peregrine*, 89 F.3d at 47; *WMW Machinery*, 960 F.Supp. at 750.

#### 3. *Cost of Obtaining Attendance of Willing Witnesses*

With the addition of the eight new defendants/cross-defendants, there appear to be many more potential witnesses residing in the United States than in El Salvador. Therefore, it would be significantly more costly to fly United States witnesses to El Salvador than it would be to fly El Salvador witnesses to the United States.

#### 4. *Necessity of Viewing the Premises*

The addition of new parties and claims does not change our prior finding that there is no need to view the Plant in order to adjudicate ESI's and Delasa's claims to their respective ownership interests therein.

#### 5. *Enforceability of Judgments*

The movants have failed to demonstrate that a judgment of this Court would be unenforceable against any of the defendants abroad. Nor have they shown that an El Salvadoran judgment would be enforceable in the United States against the defendants.

#### 6. *Other Practical Problems*

Once again, all of the relevant documents which were attached to the parties' moving papers either were executed in English or already have been translated into English. Further, the movants have failed to demonstrate that the cost of interpreters and translators would be any

---

84. To say the very least, the Court was displeased when, after having granted counsel for the Affiliates at least two extensions of time based upon their alleged need to obtain affidavits from numerous different officers located in three foreign countries, it received the Affiliates' Motion to Dismiss containing four affidavits executed by Mr. O'Toole in Texas. Counsel for the Affiliates are strongly cautioned not to disregard their obligations of candor, as officers of the court, in the future.

greater in the United States than if the litigation were conducted in El Salvador.

### 7. Administrative Difficulties/Court Congestion

In *ESI I*, we stated that we anticipated "no internal impediments to an expeditious litigation." 995 F.Supp. at 428. Coastal Corp., Coastal Power and the Affiliates now claim that the matter has not moved along swiftly because ESI and Delasa have added eight new defendants/cross-defendants, thereby prompting the instant motion to dismiss on behalf of the Affiliates. As proof that this matter would proceed more quickly in El Salvador, they assert that this motion would be rendered moot.

The only way that the issues involving the parties' ownership interests in the Plant will be expeditiously resolved is for litigation to proceed in one court, with all necessary parties appearing before the tribunal. Indeed, counsel for the movants herein had previously acknowledged the need for consolidation (in this Court) of all related actions.[85] The movants now ask this Court to dismiss the action with respect to the foreign Affiliates to allow yet another suit to proceed in El Salvador. The argument that this would result in a more expeditious determination of the parties' rights and interests is ridiculous.

After having rendered two prior opinions in this case, presiding over the related matter of *Indep. Energy Corp. v. Trigen*, 944 F.Supp. 1184 (S.D.N.Y.1996), and having reviewed the rather voluminous record for purposes of deciding the instant motions, this Court is painfully familiar with the general factual background and legal issues presented by this case such that, at this point in the litigation, it is uniquely capable of bringing this matter to a swift conclusion.

Any delay resulting from ESI's and Delasa's naming of additional defendants was caused by the Affiliates' numerous requests for extensions of time to file motion papers and the filing of a *forum non conveniens* motion that is repetitive and bordering on frivolous.

### 8. Local Interest in Deciding Localized Controversy

Here again, the movants claim that the tortious conduct alleged by ESI and Delasa took place in El Salvador, and therefore El Salvador has a greater interest in deciding this highly local controversy. As shown above, however, the Affiliates' tortious conduct occurred mainly in Texas, with additional acts occurring in New York and El Salvador. Moreover, only one newly named defendant, CTS, is an El Salvadoran corporation, not six as asserted by the movants. Therefore, this factor does not tip strongly in favor of dismissal.

### 9. Burden on Citizens of Unrelated Forum

Because New York has a legitimate interest in this litigation, this factor is not implicated. *See Peregrine*, 89 F.3d at 47.

### 10. Conflict of Laws Problems

Two of the three documents discussed in this Court's prior opinion would require the application of New York law while the PPA is governed by the laws of El Salvador. In *ESI I*, we therefore held that the courts in either forum would have to apply forum law and locating the case in New York would likely minimize the problem of applying foreign law. 995 F.Supp. at 428. Now, however, with the addition of the Affiliates as defendants, over 16 new docu-

---

**85.** *See* letter from Fred Bradley to Delasa's counsel, dated September 16, 1998, attached to Delasa's Memorandum of Law in Opposition to Affiliates' Motion to Dismiss at Ex. 28, stating:

I have discussed the matter with co-counsel for La Casa Castro and Coastal, we are all agreeable to transferring the case for resolution in New York.... [T]rial in New York before Judge Conner, a senior district judge, is something that can be set within the next several months, and we can fairly rely on any date that is given to us.

ments and agreements have been introduced into the litigation, all but 3 of which contain a New York choice-of-law clause. Thus, this factor now tips even more heavily in favor of the New York forum.

We therefore conclude that this litigation will impose burdens on all parties regardless of whether it is located in New York or El Salvador. Not only have the movants failed to establish that the balance of the *Gilbert* factors weigh strongly in favor of dismissal, the arguments made by them in this respect are acutely disingenuous. Despite the Affiliates' attempt to prevent Delasa and ESI from placing the relevant ownership and Trust documents before the Court,[86] we have now seen that the Affiliates expressly consented to the jurisdiction and venue of the United States District Court for the Southern District of New York with respect to any issues involving their respective ownership interests in the Project, and had explicitly waived any objections to such jurisdiction and venue, specifically including *forum non conveniens.*

Accordingly, the Affiliates' motion (joined by Coastal Corp. and Coastal Power) to dismiss on the grounds of *forum non conveniens* is denied.

### III. *Plaintiff's Rule 11 Motion*

In connection with its opposition to the Affiliates' Motion to Dismiss on the grounds of lack of personal jurisdiction and *forum non conveniens,* ESI filed a Notice of Cross–Motion seeking an order, pursuant to Fed.R.Civ.P. 11(b) and (c), imposing an appropriate sanction on the moving defendants and their attorneys.

As set forth in its Memorandum of Law in Opposition to the Affiliates' Motion to Dismiss, ESI argues that the Affiliates and their attorneys should be sanctioned under Fed.R.Civ.P. 11(b)(1), (2), (3) and (c) for the numerous misrepresentations made to this Court both in telephone conference and in the O'Toole and Vilanova affidavits submitted in support of their motions to dismiss, with respect to the Affiliates' involvement and ownership interests in the Plant and the extent of their respective forum related activities.

In connection with the Affiliates' motion (joined by Coastal Corp. and Coastal Power) on the ground of *forum non conveniens,* ESI seeks sanctions against the movants and their attorneys under Fed. R.Civ.P. 11(b)(1), (2) and (3) for their failure to disclose, and attempt to prevent the disclosure of, the ownership and Trust related documents which, *inter alia,* contain the Forum Selection Clause. ESI further alleges that, in view of this Court's prior decision on the matter, the *forum non conveniens* motion was frivolous and filed to harass ESI and Delasa, to cause unnecessary delay, and to increase the cost of this litigation.

ESI's Notice of Cross–Motion and Memorandum of Law, both dated February 17, 1999, were served on Coastal Corp., Coastal Power and the Affiliates by U.S. mail on February 17, 1999. The original documents were then filed with the Court and a courtesy copy of each was received in chambers on February 18, 1999.

The Affiliates oppose the imposition of sanctions on the ground that ESI failed to comply with the procedural prerequisites of Rule 11, namely: (1) that the sanctions motion must be made separate and apart from any other motion; and (2) that the motion may not be "filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Fed.R.Civ.P. 11(c)(1)(A).

---

**86.** *See* Exs. 2 and 3 attached to Delasa's Memorandum in Opposition to Affiliates' Motion to Dismiss.

We need not decide whether ESI's service of a Notice of Cross–Motion supported by a combined Memorandum of Law in Opposition to the Affiliates' Motion to Dismiss and in Support of ESI's Cross–Motion constitutes a separate and distinct motion because ESI failed to comply with the mandatory "safe harbor" provision of Rule 11 by filing the sanctions motion with the Court only one day after its service on the defendants. Accordingly, ESI's motion requesting the imposition of sanctions must be denied without a discussion of the merits of the motion. *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328–29 (2d Cir.1995); *Banfield v. UHS Home Attendants, Inc.*, No. 96 Civ. 4850(JFK), 1997 WL 342422, *3 (S.D.N.Y. June 23, 1997) (procedural requirements are strictly construed and failure to observe "safe harbor" provision mandates denial).

## IV. *Motion for a More Definite Statement*

■ Fed.R.Civ.P. 12(e) provides in pertinent part:

If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading.

"A motion pursuant to Rule 12(e) should not be granted 'unless the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it.' " *Tagare v. NYNEX Network Systems Co.*, 921 F.Supp. 1146, 1153 (S.D.N.Y.1996) (quoting *Bower v. Weisman*, 639 F.Supp. 532, 538 (S.D.N.Y.1986)).

■ The Affiliates request that this Court "dismiss the Second Amended Complaint as to these defendants for a more definite and consistent statement of the claims averred against them." Rather than ESI's pleading, it is the Affiliates' request to "dismiss the Second Amended Complaint ... for a more definite state-

ment" that strikes this Court as lacking intelligibility. Rule 12(e) provides an *alternative* to a motion to dismiss under Rule 12(b) and the relief afforded if the motion is granted is not dismissal—rather, the offending party is ordered to serve an amended pleading within ten days. *See* Fed.R.Civ.P. 12(e). Although we must therefore deny the Affiliates' request to dismiss the Second Amended Complaint, we will consider whether ESI must nevertheless provide them with a more definite statement.

First, the Affiliates argue that the Second Amended Complaint is vague, ambiguous and unintelligible because ESI defined "Coastal affiliates" to include Coastal Corp. and Coastal Power (2nd Amd. Compl.¶ 13) and, therefore, Coastal Corp. and Coastal Power are alleged to be alter egos of themselves (*Id.* at ¶¶ 14–17). Not only is this an unreasonable interpretation, but paragraphs 14 through 17 make it clear that ESI is referring only to Coastal Salvador, Coastal Nejapa and CTS collectively as the "Coastal affiliates."

With respect to the alter ego allegations, the Affiliates claim that their motion should be granted because ESI fails to "identify which defendant is referred to" and fails to "present any evidence that the corporate forms of the defendants have not been observed." The Affiliates' reliance on *Bower* in this regard is misplaced. First, production of evidence is not required at the pleading stage (and *Bower* certainly does not support the opposite proposition). Even if it were, as discussed above in our discussion of general personal jurisdiction, ESI has made a prima facie showing that the Affiliates are "mere departments" of Coastal Corp., Coastal Power and/or LCC. Second, in *Bower*, the plaintiff employed the term "defendant" without specifying which of three defendants was being identified. 639 F.Supp. at 538. The court granted the motion for a more particular statement on the ground that a defendant could not effectively respond to the complaint unless it knew

which claims the plaintiff was asserting against it. *Id.* There is no such ambiguity in ESI's pleading.

Each and every allegation of the Second Amended Complaint clearly and plainly states which defendant(s) is/are being addressed. LCC has only one subsidiary, Crystal Power, and when ESI is referring to Nejapa Power it so states. Mainly, the movants object to general references to Coastal Corp. and/or Coastal Power's "affiliates" in ESI's statement of "Relevant Facts." ESI acknowledges that the ownership and sharing agreements attached to its opposition papers were not available to it when it filed its Second Amended Complaint. However, the pleading certainly provides sufficient detail, including the dates and general subject matter of correspondence and agreements, to permit the Affiliates to identify the documents to which they are parties. Further, the Affiliates know exactly what ownership interest they possess and what role each of them had in the Project. *See* 2 James Wm. Moore et al., Moore's Federal Practice § 12.36[3] (3d ed.1997) (if movant's existing knowledge enables it to file responsive pleading, court may deny motion even if pleading is arguably vague and ambiguous).

Next, the Affiliates advance a theoretical argument as to why any allegations of fraud against the Affiliates based upon paragraph 17 would have to be dismissed pursuant to Fed.R.Civ.P. 9(b). Paragraph 17 states, "Coastal Power and/or Coastal Corp. used their/its complete dominion and control over the Coastal affiliates and Nejapa Power for the purpose of perpetrating a fraud against ESI, as more fully set forth herein." This allegation, contained in the "Parties" section of the Second Amended Complaint, clearly goes to ESI's assertion of a "mere department" theory of personal jurisdiction over the Affiliates and does not set forth an affirmative claim for relief. The causes of action asserted by ESI are carefully set forth in detail in the appropriate section of the pleading and

the Twelfth Claim for Fraud is expressly pleaded only against Delasa, LCC and Trigen.

Finally, the movants claim that ESI's Second Amended Complaint is incoherent because its allegations that, at all relevant times, Coastal Corp. and/or Coastal Power exercised complete dominion and control over Nejapa Power (2nd Amd.Compl. ¶¶ 15 and 17) are internally inconsistent with the allegations that LCC exercised complete dominion and control over Nejapa Power (2nd Amd.Compl. ¶¶ 20 and 22). This argument has in essence, however, been rendered moot by this Court's decision above with respect to general jurisdiction. The allegations complained of are set forth in the "Parties" section of the Second Amended Complaint and, as we noted earlier, are made in support of ESI's "mere department" basis for asserting general personal jurisdiction over the Affiliates. We have concluded that Nejapa Power is a "mere department" of Coastal Corp. and/or Coastal Power for the purpose of exercising general personal jurisdiction. Thus, there is no reason to require a more definite statement from ESI.

The Affiliates have been given fair notice of the claims against them, and nothing prevents them from formulating a responsive pleading. Accordingly, their motion for a more definite statement is denied.

## V. *Motion to Strike*

Coastal Power originally moved for an order pursuant to Fed.R.Civ.P. 12(f), striking the Second and Fourth Claims and additional defendants named in ESI's Second Amended Complaint. However, since the motion was filed: (1) in its Memorandum of Law in Opposition to Coastal Power's Motion to Strike, ESI confirmed that it did not intend to pursue its Second Claim and voluntarily withdrew the same from the Second Amended Complaint; and (2) in its Reply Memorandum of Law in Support of its Motion to Strike, Coastal Power conceded that the additional defen-

dants had been properly added by ESI with leave of court. The motion is therefore granted insofar as it seeks to strike the Second Claim and denied insofar as it seeks to strike the additional named defendants in ESI's Second Amended Complaint.

We now turn to ESI's Fourth Claim for Tortious Interference with the Three–Party Agreement. The elements of tortious interference with contractual relations are: (1) the existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach the contract; and (4) damages to plaintiff. *See Foster v. Churchill*, 87 N.Y.2d 744, 750–51, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996); *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 612 N.E.2d 289, 292, 595 N.Y.S.2d 931, 934 (1993). The defendant accused of tortiously interfering with the contract cannot also be a party thereto. *See Solow v. Stone*, 994 F.Supp. 173, 181 (S.D.N.Y.), *aff'd*, 163 F.3d 151 (2d Cir. 1998) (citing *Burdett Radiology Consultants, P.C. v. Samaritan Hosp.*, 158 A.D.2d 132, 136, 557 N.Y.S.2d 988, 991 (3d Dep't 1990).)

In its Amended Complaint, ESI alleged the following:

97. ESI realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 96 hereof, inclusive, as if fully set forth herein.

98. The Three–Party Agreement is a valid agreement between ESI, La Casa Castro and Delasa.

99. Coastal [Power] had knowledge of the existence of the Three–Party Agreement between ESI, La Casa Castro and Delasa.

100. Coastal [Power] intentionally and maliciously procured La Casa Castro's and Delasa's breach of the Three–Party Agreement with ESI . . .

On the motion of Coastal Power, we dismissed this claim pursuant to Fed. R.Civ.P. 12(b)(6) on the grounds that ESI failed to allege that it was a party to the Three–Party Agreement and that Coastal Power was not a party to the contract because ESI had previously alleged that Coastal Power is bound by the Three–Party Agreement as successor to Trigen and Tenneco. *See ESI I*, 995 F.Supp. at 433.

On September 16, 1998, ESI filed its Second Amended Complaint wherein it alleged the following by way of a claim for tortious interference with the Three–Party Agreement:

138. ESI realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 137 hereof, inclusive, as if fully set forth herein.

139. The Three–Party Agreement is a valid contract between Trigen, La Casa Castro, Delasa and ESI (as Delasa's assignee).

140. ESI became a party to the Three–Party Agreement by the express language of the Assignment Agreement between Delasa and ESI.

141. Trigen and La Casa Castro consented in writing to ESI becoming a party to the Three–Party Agreement.

142. Tenneco, Coastal Corp., Coastal Power and the Coastal affiliates had knowledge of the existence of the Three–Party Agreement.

143. If Tenneco, Coastal Corp., Coastal Power, and the Coastal affiliates are not considered parties to the Three–Party Agreement, these defendants intentionally and maliciously procured Trigen's, La Casa Castro's and Delasa's breach of the Three–Party Agreement with ESI . . .

ESI contends that, in its Second Amended Complaint, the Fourth Claim for tortious interference with the Three–Party Agreement is asserted as an alternative theory for relief in case a jury finds that Coastal Power is a third party unrelated to that contract[87] and that the new allegations cure the defects found in the Amended Complaint. We agree.

Coastal Power argues, nevertheless, that the new pleading contains contradictory allegations within Claim Four by virtue of ESI's reallegation and incorporation (through ¶ 138) of ¶ 129 which states that "[t]he Three–Party Agreement is a valid contract between ESI (as Delasa' s assignee), La Casa Castro, Delasa, Trigen, Tenneco (as Trigen's successor-in-interest) and Coastal Power (as Trigen's and Tenneco's successor-in-interest)." This argument is without merit. Fed.R.Civ.P. 8(e)(2) expressly permits a plaintiff to set forth alternative and even inconsistent statements of a claim, "subject to the obligations set forth in Rule 11." Although ESI should not have directly incorporated the contradictory statements contained in prior claims, this technical error does not require Claim Four to be stricken from the Second Amended Complaint. *Cf. Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA) Inc.*, 726 F.Supp. 1411, 1421 (S.D.N.Y.1989) (refusing to dismiss Count IV solely on basis that it incorporated by reference alternative allegations made in earlier counts in violation of rule against asserting multiple theories of recovery in same count).

Coastal Power further argues that ESI cannot allege truthfully or in good faith that Coastal Power is not a party to the Three–Party Agreement. Although the importance of this judicial admission on the part of Coastal Power should not go unrecognized, it is apparent from the evidence thus far placed before the Court that a jury could find the contrary to be true. As noted above, the Purchase Agreement through which Tenneco agreed to assign its interest in the Project was executed by Coastal Salvador, not Coastal Power.

Lastly, Coastal Power requests that the allegations contained in ¶¶ 105, 106 and 179 of the Second Amended Complaint, regarding conspiracy, be stricken because this Court has previously dismissed all conspiracy counts alleged against Coastal Power. In *ESI I*, we dismissed ESI's independent conspiracy claims because they were duplicative of ESI's other tort claims and because New York does not recognize a substantive tort of conspiracy. 995 F.Supp. at 433–35. In compliance with this Court's previous order, no independent conspiracy tort claims are asserted in ESI's Second Amended Complaint. The allegations of conspiratorial conduct set forth in ¶¶ 105, 106 and 179 are properly pleaded as part of the Statement of Facts and Ninth Claim seeking an accounting and the imposition of a constructive trust.

Accordingly, Coastal Power's motion to strike is granted in part and denied in part.

## VI. *Tenneco's Colorado River Abstention Motion*

We recognize that a parallel proceeding between Delasa and Tenneco is currently pending before the state court in Louisiana for purposes of the abstention doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), however, abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controver-

---

**87.** With respect to the Three–Party Agreement, ESI pleads three alternative theories: (1) Claim Three for Breach of the Three–Party Agreement (if ESI and Coastal Power are both parties to the agreement); (2) Claim Four for Tortious Interference with the Three–Party Agreement (if ESI is a party to the Agreement but Coastal Power is not); and (3) Claim Five for Damages as Third–Party Beneficiary of the Three–Party Agreement (if Coastal Power is a Party to the Three–Party Agreement but ESI is not).

sy properly before it" and is justified only in "exceptional circumstances" which are not present here. *Village of Westfield v. Welch's*, 170 F.3d 116, 121 (2d Cir.1999) (quoting *Colorado River*, 424 U.S. at 813, 96 S.Ct. 1236).[88]

■■■ Abstention is appropriate under *Colorado River*, only if the balance of the following factors overcome the strong presumption in favor of exercising jurisdiction: (1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the order in which jurisdiction was obtained; (4) the avoidance of piecemeal litigation; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Welch's*, 170 F.3d at 121.

■■■ This is not an *in rem* action and does not involve jurisdiction over property. Tenneco has never suggested that this forum is inconvenient. Further, where, as here, there have been no proceedings on the merits, and discovery has not yet been completed in state court,[89] "the fact that the state action was commenced before [Delasa filed its cross-claim against Tenneco] carries little weight." *Welch's*, 170 F.3d at 122 (quoting *Andrea Theatres, Inc. v. Theatre Confections, Inc.*, 787 F.2d 59, 64 (2d Cir.1986)). The outcome of the appeal pending in Louisiana regarding the scope of the Memorandum of Settlement between Delasa and LCC will not conflict with any proceedings before this Court. If the appellate court finds that the Memorandum of Settlement somehow includes Tenneco, the pleadings before this Court can be amended accordingly.

Moreover, Tenneco's concern over the adverse effects of piece-meal litigation is disingenuous. All parties to the Louisiana litigation have expressed their desire to consolidate the actions and proceed before this Court alone, yet Tenneco has refused to cooperate in this endeavor. *See* Exs. 11–14 attached to Delasa's Mem. in Opp. to Tenneco's Motion to Dismiss. Even if we were to dismiss Delasa's cross-claim, we would proceed to determine most of the relevant issues anyway due to the virtually complete overlap with ESI's claims against Tenneco.

Finally, although Delasa's cross-claim does not require the application of federal law, the majority of the agreements at issue are to be governed and construed under the laws of the State of New York. And, perhaps most importantly, unlike the Louisiana action, this action includes all parties necessary for a full and complete adjudication of the ownership rights in the Project and the income from the Plant.

Accordingly, Tenneco's motion to dismiss Delasa's Cross–Claim based on the *Colorado River* abstention doctrine is denied.

## VII. *Motions to Dismiss for Failure to State a Claim*

The Court's duty in determining a motion to dismiss pursuant to Fed.R.Civ.P.

---

**88.** Delasa does seek a declaratory judgment with respect to Tenneco's status as a joint venturer; however, it also seeks damages for, *inter alia*, breach of contract and unjust enrichment. Therefore, the *Colorado River* "exceptional circumstances" standard, and not the discretionary standard of *Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995), applies here. *See Welch's*, 170 F.3d at 125 n. 5.

**89.** Delasa noted that, since the commencement of the Louisiana action two years ago, the "only substantive thing that has been accomplished ... is the declaration of Personal Jurisdiction over Tenneco in New Orleans. (A forum which has far less contacts to this litigation than New York)." And "[w]ith the exception of some initial and incomplete document production (in the last few months), no discovery has been conducted." Delasa's Memorandum of Law in Opposition to Tenneco's Motion to Dismiss at p. 15 n. 31.

12(b)(6) is "necessarily a limited one." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 62 (2d Cir.1997). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States,* 82 F.3d 23, 26 (2d Cir.1996) (quoting *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). The issue is not whether the plaintiff will ultimately prevail, but whether it is entitled to offer evidence in support of its claims. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 173 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999); *Hamilton College,* 128 F.3d at 62.

In assessing the legal sufficiency of a claim, the Court may consider not only the facts alleged in the complaint, but also any document attached as an exhibit or incorporated by reference, and any matters of which judicial notice may be taken. *See* Fed.R.Civ.P. 10(c); *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991). All well-pleaded factual allegations will be accepted as true and all reasonable inferences must be drawn in favor of the plaintiff. *See Wright,* 152 F.3d at 173. However, "if the allegations of a complaint are contradicted by documents made a part thereof, the document controls." *Sazerac Co. v. Falk,* 861 F.Supp. 253, 257 (S.D.N.Y.1994) (citing *Feick v. Fleener,* 653 F.2d 69, 75 n. 4 (2d Cir.1981)).

A. *Breach of the Three–Party Agreement and Related Claims: ESI's Third, Fifth, Sixth and Eleventh Claims; Delasa's Second, Third and Fifth Claims*

■ Tenneco argues that ESI's and Delasa's breach of contract and related claims against it must be dismissed as a

matter of law because: (1) it is not and never has been a party to the Three–Party Agreement; and (2) the Trigen–Tenneco Assignment of the PPA makes it clear that Tenneco never accepted an assignment of, or assumed Trigen's obligations under, the Three–Party Agreement.

ESI and Delasa admit that Tenneco is not a signatory to the Three–Party Agreement entered into by and between Delasa, Trigen and LCC on April 28, 1994. They further recognize that a non-signatory to a contract can be named as a defendant in a breach of contract action only if the party is in privity with the plaintiff or has assumed the obligations of the contract. *See Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. 209, 215–16 (S.D.N.Y.1997) (citing *Crabtree v. Tristar Automotive Group, Inc.,* 776 F.Supp. 155, 166 (S.D.N.Y.1991) and *Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc.,* 156 A.D.2d 550, 551, 549 N.Y.S.2d 57, 58 (2d Dep't 1989)). ESI and Delasa assert that both such conditions are present.

Tenneco is alleged to be a joint venturer in the Project together with Delasa, ESI, Trigen and LCC (the "Development Group"). *See* 2nd Amd. Compl. at ¶¶ 64–67, 78–84 and 153; Cross–Claim at ¶¶ 261–270, 272, 275–289. ESI and Delasa further allege that, from the moment Tenneco was brought in to the joint venture, it attended meetings with the venture partners, received information about the Project from ESI and Delasa and participated in the negotiations and drafting of the PPA and Three–Party Agreement. *See id.*

Although the Three–Party Agreement is the controlling contract said to memorialize the obligations that each joint venturer owes to its fellow venture partners, it is not alleged to be the only evidence of who the joint venture partners were. By its very terms, the Three–Party Agreement (§§ 1(d), 4–6, 10, 14) evinces Tenneco's current involvement and future assumption of Trigen's role in the venture.[90] More-

---

**90.** Indeed, Delasa claims that the Three–Party Agreement was specifically drafted in part to

over, the allegations of the Second Amended Complaint and Delasa's Cross–Claim make it clear that other documentary evidence exists with respect to Tenneco's agreement to become a joint venturer in the Project and accept and assume Trigen's obligations under the Three–Party Agreement.[91] The contractual liability of Tenneco as a member of the joint venture may be established by a group of documents rather than solely by the Three–Party Agreement. *See Doehla v. Wathne Ltd.*, No. 98 Civ. 6087(CSH), 1999 WL 566311, at *6 (S.D.N.Y. Aug.3, 1999) ("Separate signed and unsigned writings may together constitute the 'memorandum' necessary to satisfy the statute of frauds where they collectively set forth all the terms of the contract and clearly refer to the same transaction"). Therefore, ESI and Delasa have adequately alleged privity between themselves and Tenneco for purposes of their breach of contract and related claims.

In the alternative, Delasa and ESI have alleged that Tenneco assumed Trigen's obligations under the Three–Party Agreement. The crux of Tenneco's motion to dismiss is that Tenneco agreed to assume Trigen's obligations only under the PPA and no other obligations with respect to the Project, including those under the Three–Party Agreement, and that this is shown by the following "clear and unambiguous" language of the Trigen–Tenneco Assignment:

> Trigen agrees to assign to [Tenneco] all of Trigen's rights under and interest to the PPA. Upon such assignment, [Tenneco] agrees to be responsible for Trigen's obligations under the PPA.... Nothing herein contained shall be construed as an agreement by [Tenneco] to

make Delasa's (and therefore ESI's) rights enforceable against Tenneco.

be responsible for any other obligations or liabilities of Trigen relating to or arising from the Project, including but not limited to, any obligation of Trigen to reimburse IEC for its expenses relating to the Project.

We disagree.

 First, as we held in *ESI I*, and hold independently again today, ESI's and Delasa's allegations support a finding that Trigen's rights under the PPA were limited by, and subject to, the Three–Party Agreement, and thus that its obligations under the PPA included its obligations under the Three–Party Agreement to honor Delasa's, and subsequently ESI's, equity interest in the Project. Arguably, then, as assignee of Trigen's PPA interest, Tenneco's rights similarly would be limited by Delasa's and ESI's rights.[92] It is well-settled that (except in the case of negotiable instruments) an assignee never stands in a better position than the assignor and "is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor," *Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126, 325 N.E.2d 137, 139, 365 N.Y.S.2d 808, 811 (1975); *see Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 681–82 (2d Cir.1989); that the assignee takes the assignor's rights subject to superior claims, *see Active Fire Sprinkler Corp. v. United States Postal Serv.*, 811 F.2d 747, 755 (2d Cir.1987); and that the assignment of a contract does not modify the obligations of the contract, *see Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir.1983).

the Project, to work together and cooperate to execute the [PPA], and construct and operate the plant for their joint benefit."

**91.** In its Eleventh Claim for Promissory Estoppel (¶ 196.), ESI further alleges that Tenneco "promised to, *inter alia*, compensate ESI by securing for ... ESI an interest in the Project and a proportionate share of the Plant's income, to keep ESI informed about

**92.** We are not invoking the law of the case doctrine; rather, we have reached this conclusion after examining all relevant pleadings, motion papers and cases cited therein.

In addition, we find that the language of the Trigen–Tenneco Assignment is not as "clear and unambiguous" as Tenneco contends. Contrary to Tenneco's assertion, the Assignment does *not* expressly state that nothing therein shall be construed as an agreement by Tenneco to be responsible for any other obligations or liabilities of Trigen *under any other contract or agreement* relating to or arising from the Project. Despite Tenneco's clear concern over its possible assumption of Trigen's obligations under the Three–Party Agreement (as evidenced by its pre-condition of Trigen's release therefrom), it failed to specifically exclude Trigen's obligations under the Three–Party Agreement or otherwise make an explicit reference to the Three–Party Agreement in the Trigen–Tenneco assignment.

It is also instructive that Tenneco consistently cites the broad language, "any other obligations or liabilities of Trigen relating to the Project" while omitting from its quotations the specific enumeration of obligations not being assumed which follow, "including, but not limited to, any obligation of Trigen to reimburse IEC for its expenses relating to the Project." According to the *noscitur a sociis* rule of contract construction (or its cousin *ejusdem generis*), the phrase "any other obligations or liabilities," should be interpreted as referring to obligations or liabilities similar in nature to Trigen's obligation "to reimburse IEC for its expenses relating to the Project." *See Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,* 84 N.Y.2d 430, 438, 643 N.E.2d 504, 508, 618 N.Y.S.2d 882, 886 (1994). The phrase "including, but not limited to" does not alter this analysis—the general expression is not limited to the single specific example given, but should nevertheless be restricted to obligations of the same type or class. *See Loengard v. Metal & Thermit Corp.,* 204 F.Supp. 74, 77–78 (S.D.N.Y.1962). As Trigen's obligation to reimburse IEC's expenses arose as a condition to its receipt of an assignment of IEC's rights in the Project, which together with Trigen being UTDC's successor-in-interest gave Trigen its 75% ownership interest, this paragraph in the Trigen–Tenneco assignment could be interpreted as stating only that Tenneco refused to assume any obligations which Trigen had with respect to the acquisition of its respective 75% ownership interest in the Project from its assignors and predecessors-in-interest.

Accordingly, ESI's and Delasa's claims do not directly conflict with the express language of the PPA and the Trigen–Tenneco Assignment and need not be dismissed on this basis.

With respect to Delasa's cross-claim, Tenneco argues that, even if it somehow assumed Trigen's obligations under the Three–Party Agreement by virtue of the Trigen–Tenneco Assignment, any obligations that Trigen may have owed to Delasa under the Three–Party Agreement were extinguished by the Release signed by LCC, Delasa and Trigen [93] on May 17, 1994 prior to Tenneco's execution of the Assignment.[94] Based on the allegations in Delasa's Cross–Claim, we cannot hold as a matter of law that Delasa released Trigen from any obligations owed to it by signing the Release.

By alleging in its Cross–Claim that Trigen has breached the Three–Party Agreement, Delasa has challenged the validity of the Release. Based on the facts alleged in

**93.** Tenneco acknowledges that ESI did not sign the Release and, therefore, does not argue that the obligations owed to ESI, if any, by Trigen, its successors and assigns, under the Three–Party Agreement have similarly been extinguished.

**94.** At this stage in the litigation, there is no proof in the record that the Release was in fact executed before the Trigen–Tenneco Assignment. If it were not, Tenneco's argument would be moot because the Release released only Trigen, not its successors and assigns. For the purposes of the within motion, however, we will assume that the Release was executed first.

its Cross–Claim, a jury could find that the Release is voidable due to economic duress. *See Blumenthal v. Tener*, 227 A.D.2d 183, 184, 642 N.Y.S.2d 26 (1st Dep't 1996) (where plaintiffs executed documents in midst of real estate development project when defendants/co-venturers opted not to go forward with project, leaving plaintiffs in precarious position, there was genuine issue of fact as to whether documents were executed under economic duress); *see also Nicholas v. NYNEX, Inc.*, 929 F.Supp. 727, 732 (S.D.N.Y.1996) (agreement voidable on ground of economic duress if obtained: (1) by means of wrongful threat precluding exercise of free will; (2) under press of financial circumstances; and (3) where circumstances permitted no other alternative).

▮▮▮ In addition, Delasa claims that, prior to Delasa's execution of the Release, Tenneco orally agreed to accept an assignment of Trigen's rights and assume Trigen's obligations under the Three–Party Agreement. Tenneco then proceeded to accept and enjoy all of Trigen's rights in the Project and fulfill Trigen's former role in the Development Group by arranging for financing for the Project, signing the Turnkey Contract and assuming the obligations under the PPA, all of which evidences an assignment in fact. Assuming that such an oral assignment and assumption agreement exists, Tenneco argues that it would be unenforceable pursuant to the New York Statute of Frauds. *See* N.Y.Gen.Obl.Law § 5–701(a)(1). However, based on the allegations in Delasa's Cross–Claim (and ESI's Second Amended Complaint should ESI assert the existence of an oral assignment and assumption agreement), Tenneco could be prevented from raising the statute of frauds as a defense on the grounds of either promissory estoppel, equitable estoppel, part or complete performance of the agreement. *See, e.g., Federation Internationale Du Sport Universitaire v. Greater Buffalo Athletic Corp.*, No. 93–CV–0635E(F), 1994 WL 411908 (W.D.N.Y. Aug.4, 1994) (dis-

cussing all three grounds); *Ebker v. Tan Jay Int'l, Ltd.*, 739 F.2d 812 (2d Cir.1984) (part performance by all parties to oral joint venture agreement); *Marcraft Recreation Corp. v. Francis Devlin Co.*, 506 F.Supp. 1081 (S.D.N.Y.1981) (part performance of oral contract in violation of N.Y.Gen.Obl.Law § 5–701(a)(1)); *Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34 (2d Cir.1977) (promissory estoppel); *Brockport Developers, Inc. v. 47 Ely Corp.*, 82 Misc.2d 310, 369 N.Y.S.2d 601 (1975) (equitable estoppel/part performance of oral assignment contract). *See also Mega Tech Int'l Corp. v. Miller Elec. Mfg. Co.*, No. 97 Civ. 1085(DLC), 1997 WL 790750, at *1–4 (S.D.N.Y. Dec.23, 1997) (summary judgment precluded where could find an assignment of exclusive distributorship contract "in fact or by operation of law" where alleged assignee accepts and enjoys all of alleged assignor's rights and assumes assignor's obligations with knowledge and acceptance by other party to agreement); *Mann v. Ferdinand Munch Brewery*, 225 N.Y. 189, 121 N.E. 746 (1919) (seminal case involving assignment of lease by operation of law). "Suffice it to say, equity will not countenance a ritualistic invocation of the Statute of Frauds, especially where the party claiming its protection has acquiesced in and profited from the very agreement it now seeks to abjure." *Brockport*, 82 Misc.2d at 315, 369 N.Y.S.2d at 607–08.

Accordingly, Tenneco's motion pursuant to Fed.R.Civ.P. 12(b)(6), insofar as it seeks the dismissal of the Third (Breach of Three–Party Agreement), Fifth (Third–Party Benefits), Sixth (Breach of Fiduciary Duty) and Eleventh Claims (Promissory Estoppel) of ESI's Second Amended Complaint and the Second (Declaratory Judgment), Third (Breach of Fiduciary Duty) and Fifth (Breach of Three–Party Agreement) Claims of Delasa's Cross–Claim, is denied.

### B. Tortious Interference: ESI's Fourth and Eighth Claims

ESI alleges that Tenneco tortiously interfered with, or induced the breach of, the

Three–Party Agreement (Fourth Claim) and the Delasa–ESI Assignment (Eighth Claim). Tenneco argues that these claims are barred by the applicable statutory limitations period and otherwise fail to adequately plead "but for" causation.

■ Under New York law, an action for tortious interference with (or inducement to breach)[95] contract must be commenced within three years from its accrual. *See Norris v. Grosvenor Marketing Ltd.,* 803 F.2d 1281, 1287 (2d Cir.1986) (citing N.Y.C.P.L.R. § 214(4)); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia,* 23 F.Supp.2d 439, 451–52 (S.D.N.Y.1998). Tenneco ultimately conceded (and correctly so) that a claim for tortious interference accrues on the date on which the plaintiff sustains an injury from the breach, not on the date when the defendant "interfered" with the contract. *See Kronos,* 81 N.Y.2d at 94–6, 612 N.E.2d at 291–93, 595 N.Y.S.2d at 933–35 (damages are required element of claim for tortious interference, therefore, claim does not accrue until plaintiff suffers injury resulting from induced breach).

■ Tenneco argues that ESI was injured when Tenneco assigned the PPA to Coastal Power[96] without arranging for ESI to be compensated in proportion to its interest in the Project. However, this is not a reasonable inference to be drawn from ESI's pleading. ESI alleges that all Tenneco ever had, and thus was able to transfer to Coastal Power, was its 75% interest in the Project and income from the Plant. Thus, when Tenneco subsequently transferred its 75% interest to Coastal Power and received compensation therefor, there would be no justification

for ESI to demand a portion of the proceeds from Tenneco.

The only reasonable inference that can be drawn from ESI's Second Amended Complaint is that ESI sustained no injury from Tenneco's actions until CEL began making payments under the PPA in September of 1995—payments which constituted income from the operation of the Plant, no portion of which was received by ESI. The Second Amended Complaint was filed within three years thereafter, on September 16, 1998. Therefore, ESI's claims against Tenneco for tortious interference are not time-barred.

■ Tenneco's remaining arguments concerning the incorporation of inconsistent prior allegations into the Fourth and Eighth Claims, namely those alleging that the defendants "conspired" together (which Tenneco argues preclude a finding that the parties to the contracts would not have breached them "but for" Tenneco's inducement) and that Tenneco did not have knowledge of ESI's involvement in the Three–Party Agreement or the existence of the Delasa–ESI Assignment (which Tenneco asserts preclude the contrary allegation of knowledge on the part of Tenneco necessary to state a claim for tortious interference), are without merit. As we stated above, Fed.R.Civ.P. 8(e)(2) expressly permits a plaintiff to set forth alternative and even inconsistent statements of a claim, "subject to the obligations set forth in Rule 11." Although ESI should not have directly incorporated the contradictory statements contained in prior claims, this technical error does not require dismissal.[97]

---

95. For simplicity's sake, we will hereinafter refer to such claims as claims for tortious interference.

96. As noted *supra* at n. 10, the PPA was actually assigned to Coastal Aruba Holding Company N.V. but this fact does not alter our analysis of the merits of Tenneco's argument.

97. We respectfully decline to follow *Rinaldi v. James J. Duane & Co.,* 691 F.Supp. 807

(S.D.N.Y.1988) which appears to be inconsistent with the spirit of Fed.R.Civ.P. 8. To the extent that *Sharma v. Skaarup Ship Management,* 699 F.Supp. 440 (S.D.N.Y.1988) supports Tenneco's argument that the inclusion of an allegation of conspiracy elsewhere in the complaint precludes the alternative allegation that "but for" the defendant's interference, the parties would not have breached the contract, we must also respectfully disagree

Whether Tenneco had knowledge of the existence of the Three–Party Agreement and the Delasa–ESI Assignment are valid issues of fact to be determined in this action. ESI's Fourth and Eighth Claims each adequately allege the necessary elements of knowledge of the contract (¶¶ 142 and 166), intentional and malicious procurement of its breach (¶¶ 143–44, 167 and 169) and "but for" causation. The Second Amended Complaint contains numerous allegations showing that "but for" Tenneco's actions, the parties would not have breached the agreements, *e.g.,* but for Tenneco's insistence, Trigen would not have requested and Delasa and LCC would not have agreed to release Trigen from the Three–Party Agreement and approved the assignment of the PPA to Tenneco without notification to ESI, and but for Tenneco's interference, LCC would not have entered into an agreement with Tenneco without providing for ESI. (*See also* ¶¶ 145 and 170 "as a direct and proximate result of defendants' intentional procurement . . .").

### C. *Fraud: ESI's Twelfth Claim; Delasa's Tenth Claim*

In its Twelfth Claim for Fraud originally asserted against Delasa, LCC and Trigen, ESI alleges that:

202. These defendants . . . made representations of material facts to ESI, including but not limited to, that they would keep ESI informed promptly about the Project and important communications made or received in connection with the Project, that they would work together and cooperate with each other to execute the [PPA], and to construct and operate the plant, that they would not enter into any other agreements or joint ventures concerning the Project except as specifically consented to by all the parties in writing,

and that they would not compete with each other on the Project.

203. These representations of material facts were false.

204. These misrepresentations of material facts were made knowingly and intentionally by the aforesaid defendants for the purpose of inducing ESI to allow Trigen alone to execute the [PPA] with CEL and to allow Delasa and [LCC] to represent ESI at the signing of same.

205. ESI justifiably relied on the aforesaid misrepresentations of material facts by allowing Trigen alone to execute the [PPA] and allowing Delasa and [LCC] to represent ESI at the signing of same.

206. ESI was injured and prejudiced as a result of its reliance . . . because Trigen simultaneously executed and assigned the [PPA] to Tenneco without ESI's knowledge, and without securing or protecting ESI's interest in the Project; Trigen, Delasa and [LCC] denied or concealed ESI's interest from Tenneco; [LCC] subsequently misrepresented to Tenneco that [LCC] and Delasa were the only other parties with interests in the Project; [LCC] negotiated secretly with . . . and entered into sharing agreements with Tenneco, [Coastal Power and Delasa], without ESI's knowledge and consent.

207. By reason of the foregoing, ESI's interest in the Project and the Plant's income were eliminated and ESI sustained damages . . . and is entitled to punitive damages.

LCC moves to dismiss this claim, pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) on the grounds that it: (1) fails to plead fraud

---

for the reasons stated above. This case is also distinguishable from *Sharma* because ESI does allege that Tenneco was the driving force behind the breaches.

with sufficient particularity; (2) alleges a fraudulent purpose which belies the other allegations in the Second Amended Complaint; and (3) the claim is nothing more than a restatement of ESI's claim for breach of the Three–Party Agreement and does not allege facts that give rise to a strong inference of fraudulent intent. ESI cross-moves for leave to amend in the event LCC's motion be granted. For the reasons discussed below, LCC's motion to dismiss and ESI's cross-motion for leave to amend are both granted.

■ In pleading a claim for fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires all "circumstances constituting fraud" to be "stated with particularity." Fed.R.Civ.P. 9(b). This requirement is satisfied if the pleading adequately specifies the statements alleged to be false or misleading, the respect in which the statements are fraudulent, when and where the statements were made and by whom. *See Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Three important goals are served by this rule: (1) defendants are provided with adequate notice of the claims against them; (2) defendants' reputations and goodwill are protected from unfounded allegations; and (3) the filing of strike suits is deterred. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). In furtherance of these goals, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.,* at 1247.

Although ¶ 202 provides a detailed statement of the precise representations made, it states only that these representations were made by the defendants, LCC, Delasa and Trigen. This gives no indication to LCC which specific statements ESI is alleging that LCC made (although a reasonable interpretation would be that each defendant made all of them) or where, when or by whom such statements were made. In its Memorandum in Opposition, ESI argues that it should be clear that the statements came from the Three–Party Agreement, which is annexed to the Second Amended Complaint as Exhibit A, and that Roberto Vilanova made such statements, as President of LCC on May 12, 1994, the date on which he executed the Delasa–ESI Assignment which is attached to the Second Amended Complaint as Exhibit B. We disagree that the simple allegation of statements contained in ¶ 202 constitute a clear road map which would lead LCC directly to the relevant information contained in the exhibits. Nor may ESI correct this deficiency through "amendment by memorandum."

Further, as stated in ¶ 204, the alleged purpose and effect of the fraudulent scheme (*i.e.,* inducing ESI to allow Trigen alone to execute the PPA) is nonsensical in light of the previous allegations in the Second Amended Complaint (incorporated by reference into the Twelfth Claim at ¶ 200) which demonstrate that only Trigen (and never ESI as an independent entity, separate and distinct from IEC) had a contractual right to execute the PPA. Here again, ESI's Memorandum of Law presents a coherent explanation of what was meant by these paragraphs, *i.e.,* that ESI (really Bob McVay) had the power (by virtue of McVay's former association with IEC) to induce IEC to assign to Trigen its right to execute the PPA, and that ESI only did so in reliance on LCC's and Trigen's promises (set forth in ¶ 202) to protect ESI's interests which otherwise would have been protected by IEC's signing of the PPA. Contrary to ESI's assertion, however, these facts cannot be gleaned from the brief statement in ¶ 62 that "[i]n consideration for ... Trigen's consent to Delasa's assignment to ESI ... IEC assigned its rights and interest in the Project to Trigen by a Letter Agreement dated May 12, 1994, which was delivered to Trigen on May 16, 1994," and we cannot allow ESI's "amendment by memorandum" to correct this deficiency.

■ Finally, allegations of a mere breach of contract will ordinarily not suf-

fice to support of finding of fraudulent intent. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir.1997). However, fraudulent intent may be inferred "when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident." *Id.* (citation and quotations omitted). Although the immediacy of LCC's breach is evident from the allegations contained in the "Relevant Facts" section of the Second Amended Complaint, which in turn are incorporated into the Twelfth Claim by ¶ 200, the timing of the relevant events should be simply and concisely set forth in the Twelfth Claim of ESI's Third Amended Complaint which we grant ESI leave to file as discussed more fully below (*i.e.*, that on May 12, 1994, by signing the Delasa–ESI Assignment, LCC promised to protect ESI's interest then, on May 17, 1994, LCC participated in the Trigen–Tenneco Assignment without protecting ESI's interest and thereafter, in June of 1994 negotiated its own deal with Tenneco to eliminate ESI's interest and keep 100% of the income of the Plant for themselves).

 Leave to amend a pleading should be freely granted unless leave was sought in bad faith, granting leave would cause undue delay or prejudice the opposing party, or amendment would be futile. *See* Fed.R.Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The amendment of a fraud claim would be futile if (1) the amended pleading would not survive a motion to dismiss for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6), or (2) numerous amendments show an inability to meet the particularized pleading requirements of Fed. R.Civ.P. 9(b). *See S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir. 1979) (Fed.R.Civ.P.12(b)(6) standard); *Nettis v. Levitt*, No. 96–CIV–0806 (BSJ)(SEG), 1998 WL 397880, *2 (S.D.N.Y. July 15, 1998) (same); *O'Brien*

*v. Price Waterhouse*, 740 F.Supp. 276, 284 (S.D.N.Y.1990), *aff'd*, 936 F.2d 674 (2d Cir. 1991) (inability to cure 9(b) defects).

There is no evidence before the Court, and LCC does not suggest, that ESI has sought leave to amend in bad faith or that granting leave would cause undue delay or prejudice to LCC. Further, as ESI's Twelfth Claim for fraud appeared for the first time in the Second Amended Complaint, this would be ESI's first attempt to replead. Finally, as the discussion above reflects, ESI will be able to cure the defects which have lead to today's dismissal of its Twelfth Claim, therefore, amendment would not be futile.

Accordingly, LCC's motion to dismiss the Twelfth Claim of the Second Amended Complaint and ESI's cross-motion for leave to amend are granted.

Finally, LCC and Coastal Power move to dismiss the Seventh and Tenth Claims in Delasa's Cross–Claim. However, in its Memorandum of Law in Opposition to LCC and Coastal Power's Motion to Dismiss, Delasa confirmed that: (1) it did not intend to pursue its Seventh Claim and voluntarily withdrew the same from its Cross–Claim; and (2) the Tenth Claim for fraud is not being asserted against Coastal Power (only LCC), despite the mention of the name "Coastal" in the caption heading of the claim. And recently, by Notice of Dismissal dated July 28, 1999 (so ordered by this Court on August 16, 1999), Delasa dismissed, without prejudice, all claims asserted against LCC.

Accordingly, LCC and Coastal Power's motion is granted insofar as it seeks dismissal of the Seventh Claim and is denied, as moot, insofar as it seeks dismissal of the Tenth Claim of Delasa's Cross–Claim.

## CONCLUSION

For the reasons discussed above, (1) Coastal Salvador, Coastal Nejapa, CTS, Nejapa Power and Crystal Power's motions to dismiss for lack of personal jurisdiction are denied; (2) Coastal Corp.,

Coastal Power, Coastal Salvador, Coastal Nejapa, CTS, Nejapa Power and Crystal Power's motions to dismiss on the ground of *forum non conveniens* are denied; (3) ESI's cross-motion for sanctions is denied; (4) Coastal Salvador, Coastal Nejapa, CTS, Nejapa Power and Crystal Power's motion for a more definite statement is denied; (5) Coastal Power's motion to strike is granted insofar as it seeks to strike the Second Claim and denied insofar as it seeks to strike the additional named defendants, Fourth Claim and allegations of conspiracy in ESI's Second Amended Complaint; (6) Tenneco's motion to dismiss is denied; (7) LCC's motion to dismiss the Twelfth Claim in ESI's Second Amended Complaint is granted; (8) ESI's cross-motion to amend is granted; and (9) Coastal Power and LCC's motion to dismiss is granted insofar as it seeks dismissal of the Seventh Claim and is denied, as moot, insofar as it seeks dismissal of the Tenth Claim of Delasa's Cross–Claim.

SO ORDERED.